DeRon McCoy,Jr #76894
P.O.Box 2
Lansing,Ks 66043

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

DeRon McCoy,Jr,plaintiff,

V.

Aramark,correctional services,

Julie Dockendorff,Aramark dietitian,
in her individual and official capacity,

Patricia Berry,K.D.O.C State contract
monitor,in her individual and official
capacity,

Cheryl Allen,K.D.O.C Dietitian,in her
individual and official capacity,

Rabbi M.Pilly,Aramark religious Authority,
in his individual and official capacity,

Sheri
Bo. Burns,Aramark supervisor,at L.C.F Max,
in her individual and official capacity,

John Doe ,Aramark worker,in his individual
and official capacity, D

Randy singletary ,Aramark supervisor,in his
individual and official capacity, Defendants

Case no.5:16-cv-03027-SAC-DJW

CIVIL RIGHTS COMPLAINT
PURSUANT TO 42 U.S.C
§1983

Thicold Amended
complaint

## A.JURISDICTION

1)  DeRon McCoy JT        , is a citizen of Kansas who present

    resides at  LCF PO Box 2 lansing ,Ks 66043            .


2)  Defendant Aramark correctional services is a corporation

    incorporated under the laws of the state of Kansas     and

    has its principal place of business at Aramark tower,1101

    Market street,Philadelphia,PA119107.


3)  Defendant  Julie Dockendorff is a citizen of Kansas ,and

    is employed as Aramarks Dietitian. At the time the claims

alleged in this complaint arose this defendant was acting

under the color of state law. this defendant is the Aramark

dietician who does the diets for K.D.O.C inmates.

4) Defendant Patricia Berry is a citizen of Kansas,and is employed

as K.D.O.C state contract monitor.At the time the claims

alleged in this complaint arose this defendant was acting under

the color of state. This defendant is the person who over

sees the state contract between Ararmark and K.D.O.C.

5) Defendant Cheryl Allen is a citizen of Kansas,and is employed

as K.D.O.C Dietitian.At the time the claims alleged in this

complaint arose this defendant was acting under the color of

state law. This defendant is responsable for the menus of the

K.D.O.C inmates.

6) Defendant Rabbi M. Fellig is a citizen of Florida   and is

employed as the Aramark religiuos authority.At the time the

claims alleged in this complaint arose this defendant was

acting under the color of state law. This defendant works

as the Ararmark religios authority and was part of implementing

the CRD Menu for K.D.O.C inmates.

7) Defendant Shea Burns is a citizen of Kansas and is employed as

the Aramark supervisor at L.C.F max. At the time the claims

arose this defendant was acting under the color of state law.

This defendant supervises the immediate opperation of the max

custody kicthen of L.C.F.

8) Defendant Randall singletary is a citizen of Kansas,and is employed as

a inmate supervisor with Ararmark Corporation.At the time the claims alleged in this complaint arose this defendant was acting under the color of state law.This defendant is the supervisor of the inmates that work in the max kitchen at L.C.F Max.

1₱)   Jurisdiction is invoked pursuant to 28 U.S.C. §1343(3);42 U.S.C. §1983; R.L.U.I.P.A §2000 cc.x    .

## B. NATURE OF THE CASE

⟨12⟩    On March 13,2014, while visting the chaplins office in the max facility at Lansing Correctional Facility I spoke to Chaplin Richard Dunn about a inmate request that I had submitted requesting to be placed on modified kosher diet in accordance with the practicing of my religious beliefs(Jewish). I was informed by Chaplin Dunn that there was no Kosher modified diet currently provided by Ararmark correctional services for the prisoners in K.D.O.C custody. I was told that the only modified diet currently provided was the certified religious diet meals. I asked if the religious diet was Kosher. Chaplin Dunn told me that he "was not even allowed to say that the religious diet was kosher". After being told this information by Chaplin Dunn I then began my own research into the religiuos diets and what the religious diets meals consisted of and how it was prepared and served. I obtained a religious diets meal menu for men inmates for week one and week two,each begining on thursday and stopping on wensday..This menu was for breakfast,lunch,and dinner. At first glance it appeared that the prisoners are provided with many entrees that are certified Kosher.Beside many of the meal

2

10) Defendant Paul Church is a citizen of Kansas and is Employed as the head supervisor at Aramacks central office in Kansas. At the time the claims alleged in this complaint arose this defendant was acting under the color of state law. This defendant is the head supervisor over each kitchen operated by Aramack at each K.D.O.C facility.



items the religious meals menu indicates that the items are
w/kosher symbol. To a person who is of Jewish religion,race or
many of the other Judiac type religions who require kosher food,
that type of marking w/kosher symbol means that when the person
recieves the food item that it is factory sealed and unopened
and has a kosher symbol "K",or"U" affixed to the package that
tells the consumer that the food product is certified kosher
meeting the very strict degree of approval to be labeled as certified
kosher. On quite alot of the other food items on the religious
diet meal menu there are no such indications as w/kosher symbols,
such as rice,noodles,beans,lettuce,garden salad,mixed vegetables,
and flour tortillas(which are not kosher). The religious menu
is signed by Cheryl Allen,Julie Dockendoff,Patricia Berry,and
Rabbi M.Gilley. After reading the religious meals menu I then
went to the dinning hall during the time religious diets was
being served,to personally see what was being served and how
it was being served to the prisoners on religious meals. I
walked through the serving line and recieved a religious meal
tray I was handed a dark brown plastic reusable meal tray
(that is similar to the plastic reusable meal tray used to
serve regular meals on to prisoners who eat regular meals,just
different in color). After getting the empty meal tray(dark
brown in color) I proceeded in the meal line and,as I did
a differnt prisoner kitchen worker laddle or placed a different
food item into the various sections of the tray I was holding.
None of these food items were served in a unopened,factory
sealed package besides the vegetable speard.The bread was two

slices of regular white bread, the main entree appeared to be
chicken or turkey in a creamy sauce with vegetables, rice, and
salad with the salad dressing already mixed into it. Each food
item was laddled/scooped from warming pans sat into the same
warmers used to warm and serve the regular meals to prisoners.
In fact the only defference it seemed between the regaular
meals and the religious meals was the sliced bread(regular
meals get homemade rolls) and the main entree. I then sat
down at one of the tables as I ate the meal  I closely inspected
the dark brown tray and noticed that the plastic was scuffed
at the edges and the tray had deep pitmarks inthe tray I then
followed the other prisoners after a few got done with there
meals, these prisoners placed there dirty trays through the
slot in the kitchen wall where prisoners in the whole max
facility place there dirty trays after eating and before leaving
the dinning hall. I peeked into the slot/opening and observed
the prisoner whos job it was to clean trays, going through the
same procedure cleaning the religioustrays as he would clean
the regular trays (which is dumping the left over contents of
the tray into a trash can then placing the trays onto the
conveyor racks of the industrial dishwasher to run through
to be washed). I then again went to religious meals during
dinner meal time and it was the same process with slightly
different food items served. None of the food items were served
in a sealed unopened pakage and therefore no items were labled
with a kosher symbol like is advertised on the religious diets
menu. For the next approx Ten(10) days I began to ask various
prisoners  who I knew worked in the max kitchen as religious

5

meals cooks,line servers,and dish washers. As to how the
religious meals were cooked,were they were prepared,were the
utensils were kept at,were the serving pans that the religious
meals were served out of were kept,were the reusable religious
meal trays were kept, and were they stored the food for religious
meals. All of the prisoners kitchen workers (approx seven persons)
relayed to me the same type of answer to my inquiries (That
the religious meals were not cooked or prepared in the room
designated for preperation and cooking of the certified religious
diets,that the certified religious meals were prepared and
cooked on the same tables and areas where regular meals are
prepared. That the utensils for religious meals are kept in
the religious diets meal room,but brought out of that room to
the serving line during meal times,but that the serving pans
that are used  to serve religious diets and regular diets meals
are the same pans used for serving both type of diets and are
kept and washed in the same areas. On or about Dec 5,2014 I began work
as a electrical work on the electrical crew at Lansing Correctional
facility,the electrical crew I worked for was called in for
a work order at the max kitchen. The work order included a
broken cord on the warmer that the serving pans that are filled
with food are kept in on the serving line while serving meals
to the prisoners and a electrical range top stove in the (CRD)
room that is supposed to be used to prepare the (CRD) meals. I
personally went into the certified religious diets room to
clarify what the electrical problem was in the(CRD) room. After
being directed by one of the Aramark employees. I observed that
the electrcal range top stove was not operable. The knobs were

not present to be able to turn the ranges on and on some of
the switches used to operate the ranges you could not even
replace the knobs due to there not being shafts to place the
knobs onto. making it impossible to turn the range top burners
on even if the ranges worked (which they did not). The electrical
crew boss and I then went into the electrical room were the
circuit breaker boxes are located for the electrical compotents
and circuits for the kitchen and turned the power supply(circuit
breaker) off to the electrical stove top since it,(the electrical
stove)was not operable and was a safty hazard to keep electrical
power supplied to it. I next proceeded to the serving line area
to fix the broken power cord to the warmer. When I entered the
the serving line area I observed the warmer tipped foward with
the and inner workings and electrical wires exposed. There was
numerous cockroaches crawling all over the warmer along with
left over food particles and what appeard to be cockroach
excretment. I proceeded to fix the power cord, once I was finished
the Aramark employee checked to make sure the warmer was operable.
I then asked the employee " are you going to clean that?"
referring to,while pointing at the underneath of the warmer.
To which he replied "no" I then said "man theres cockroaches
all over it though". He just shrugged his shoulders and told
one of the prisoners to set the warmer up,    put water in it,
and turn it on. I then proceeded back to the area the electric
crew boss was standing near the officers station to tell him
that I had fixed the electrical wire. After I did that the
electric crew supervisor began a conversation with another crew
supervisor and I took the oppurtunity to investigate more. I

noticed a inmate stirring food in a large pressure cooker(steam kettle) I walked over to him and asked him if one of the kettles were used for cooking the (CRD) meals. The inmate pointed at the kettle directly next to the one he was currently stirring food in no more than approx 3 feet away. As the inmate began to laddle food out of the kettle using a large laddle into the serving pans I asked is that the dinner for regular meals to which he replied "yes". I then walked over to a inmate who was cutting up turkey and various other foods on a table directly in front of the (CRD) room and asked him"what tables do they use to prepare the (CRD) meals?" to which he pointed down at the table he was cutting up turkey and replied          "here, but they already           did religious meals". I then observed a open  a box with a loaf of bread laying beside it. I walked over to where the box was, I first closely inspected the loaf of bread looking for any symbols indicating that the bread was kosher I observed a plain clear see through plastic wrapped loaf of bread with no symbols markings or even nutrional information (this bread was identical to the bread served to religious diets). I then began to inspect the opened cardboard box inside was several identically wrapped loafs of bread. On the side of box was a brand name and various information,but the box lacked any symbols or markings verifying that the bread was kosher. I then walked back over to where the eletric crew boss was and me and the rest of the electric crew left the kitchen.

On December 12,2014 me and the electric crew again were called to the kitchen on a work order to fix a circuit board sensor that was shooting sparks out of it. while the electric

crew boss was working on the sensor I observed a inmate in
the certified religious diets room so I walked over to the
room I then asked him if he could show me what the main entree
of the religious meals  was packaged in before it was cooked
and served to the inmates. He then told me that it had "already been
cooked". I then told him I was "really only was interested in
seeing the package that the meal entree was packaged in before

cooking". The inmate then reached into the trash can near him
and grabbed a clear package out of it. He held this package out
for me  to see this package, the package had no kosher markings
or symbols,nor did this package have nutritional information.
In fact the only markings that were present were "Beef stroanoff"
written across the package in red marker. I asked the inmate
if all the (CRD) meal entrees were marked similiarly and he
replied "Yes, but with different writting identifying the contents
of the package. I then went back over to were the electric crew
was standing and then proceeded back to the maintenance shop.
As of October 7,2015 there has been no change to the proceedure
of preparing (CRD) nor has there been and change in the meal
compents served in the (CRD). none of the meals are served
factory sealed with kosher symbols.


### C. CAUSE OF ACTION

Plaintiff  reallege and Incorporate by reference Paragraph 1-12.

1)   I allege that the following of my constitutional rights, privileges
     or imunities have been violated and that the following facts
     form the basis for my allegations:

     A)(1) Count 1:   First amendment free exercise clause,
                      and the (RLUIPA)

(2) Supporting facts:

Defendants Aramark correctional services (the food services provider for every K.D.O.C facility), Julie Dockendoff, and Cheryl price (the head supervisor at the Central Office in Kansas for Aramark K.D.O.C Branch), Intentionally, with reckless and or callous indifference violated the plaintiffs First Amendment free exercise clause by implementing and enforcing a statewide policy and practice at every K.D.O.C facility of obtaining there meal and meal compenants for the (CRD) from a manufactuer that is not a reliable, trusted, certified Kosher purveyor. The meals and meal components bought by Julie Dockendoff and Aramack for the (CRD) at every K.D.O.C facility have no Kosher symbols or labels identifying them as being approved by one of the certified Kosher purveyors and in fact have no Kosher symbols at all and are not Kosher, said defendants enforce this policy statewide for the (CRD) while claiming its Kosher when its not and that said defendants did so knowing, that the meal components are not Kosher. with the intent to deprive the plaintiff of his rights.

Defendants Aramark correctional services, K.D.O.C, Patricia Berry, cheryl price, Julie Dockendoff, and Rabbi Mc Gilly, the policy makers for the (CRD) and (CRD) menu. Intentionally, with reckless, and or callous indifference violated the plaintiffs First Amendment free exercise clause, by making, implementing and enforcing a statewide policy and practice at every K.D.O.C. facility, of not serving the plaintiff a fully Kosher meal that meets all the Jewish dietary laws for its meal components and preparation process, The policy inacted by said defendants implemented the (CRD) meal which is not Kosher has no Kosher symbols are not individually factory pre-packed meals that are stored, cooked and served sealed and said defendants

did so knowingly with the intent to deprive the plaintiff of his constitutional rights.

Defendants Aramark correctional services, K.D.O.C, Patricia Berry, Cheryl Allen, Julie Dockendorff and Rabbi M.Gilly, The policy Mak for the preparation and handling of the (CRD) Meals, Intentionally wit reckless and or callous indifference violated the plaintiffs First Amendment free exercise clause by Making, implementin and enforceing a statewide policy and procedure at every Kldoc facility for preparation of the (CRD) Meal that does Not Meet Jewish dietary laws for preparation of Kosher Meals. The policy for preparation implemented by said defendants do Not require the (CRD) Meats to be prepared in the room set aside for (CRD) Meal preparation said policy also does Not require that pots, pans Non-disposable trays, and secuing utensils to be washed and stored seperately from other c utensils used for regular Meals. The (CRD) policy for washing and handling utensils has pots, pans and utensils being stored, washed and used for the preparation of regular Meals. The policy also has the (CRD) being prep cooken and served in the same area as regular Meals. Said Defendants did so knowing that this violated plaintiff rights.

Defendants Aramack correctional services, K.D.O.C, Patricia Berry, cheryl Allen, Rabbi M.Gilly, Sheri Burns, Randy Singletary, and Paul Church. Intentionally with reckless and callous indifference violated the plaintiffs First Amendment free exercise clause by deneing the plaintiff his right to be served a Factory sealed, Stored, cooked and served Kosher Meal with kosher symbols (that Meet all Jewish dietary laws for contents and Manufactureiu of Meals), as well as washing and storage of vessels and utensils that Meet Jewish dietary laws. The defendants and every K.D.O.C facility only Serve the (CRD). The Meal components served for the (CRD) have

No Kosher markings or symbols and are Not Individually factory pre-packaged meals and are Not stored, cooked and served still in the package. The defendants and every K.D.OC facility operated by Aramark Store, wash and use the utensils, pots, pans and trays used for preparation of the (CRD) for the preparation and use for regular meals. Said defendants did so knowing such acts violated the plaintiffs rights.

Defendants Aramark correctional services, K.D.O.C, Randy Singletary, The head supervisor for Aramark at L.C.F, Shei Burns, Shift Supervisor for Aramark at L.C.F and Paul Church, the head supervisor for Aramarks central office, Intentionally with reckless and callous indifference violated the plaintiffs rights by failing to supervise the preparation and sealing of the (CRD) meals and sealing utensils used for (CRD). Defendants Singletary and defendant Burns both were on-site at L.C.F and Knew that the (CRD) meal components arent Kosher and served them or directed the meal components to be served as Kosher. Defendant Paul Church periodically visits each kitchen of every K.D.OC facility and Knows that the meal components and preparation of the (CRD) does Not meet Jewish dietary laws for content, preparation and serving of Kosher meals and did nothing to change or fix said wrongs and each defendant did so Knowingly and with the intent to deprive the plaintiff of his rights.

That each defendant intentionally committed each act contained in each paragraph of the cause of action of plaintiffs complaint with malicious intent to deprive the plaintiff of his constitutional rights in order to save money and cut cost by Not serving factory pre-packaged Kosher TV-Dinners. Plaintiff has been and will continue to be irreparably injured by the conduct of the defendants unless the court grants the declaratory and Injuctive relief plaintiff seeks.

## D. PREVIOUS LAWSUITS AND AMINISTRATIVE RELIEF...

1) Have you begun other lawsuits in state or federal court dealing
with the same facts involved in this action or oterwise relating
to the conditions of your imprisonment? Yes ☐ No ☒ . If
Your answer is "YEs", descibe each Lawsuit.( If there is more
Than one Lawsuit, descibe the additional lawsuits on another
piece of paper,using the same outline.)
piece of paper,using the same outline.)

    a) Parties to previous lawsuits:

      Plaintiffs:_____

      Defendants:_____

    b) Name of court and docket number_____

    c) Disposition (for example: Was the case dismissed? Was it

      Appealed?Is It still pending?)

    d) Issues raised_____

    e) Approximate date of filing lawsuit_____

    f) Approximate date of disposition_____

2) I have previously sought informal or formal relief from the

appropiate administrative officials regarding the acts complained

of in part C ☒ Yes ☐ No. If your answer is "Yes",

briefly descibe how relief was sought and the results. If

your answer is "No",briefly explain why adminsrative relief was

not sought.

    On March 13,2014 I sought informal resolution concerning

being placed on aKosher modified diet by speaking personally

with the chaplin at L.C.F (Chaplin Richard Dunn). I was told

by Chaplin Dunn that the (CRD) was the only modified diet

provided besides the vegatarian diet. On March 25,2014 I wrote a formal grievance  that was denied and appealed that decesion to the warden of L.C.F and was again denied,I then appealed that decesion to the secretary of corrections and it was again denied. The grievance at all levels conceaned the CRD Meal and Meal components not being Kosher, The trays not being one use-trays, and the pots, pans and serving utensils not being stored,washed & cleaned property in order to be Kosher and thus usable for serving

### E. REQUEST FOR RELIEF

1)     I believe that I am entitled to the following relief:

a) Nominal  relief in the amount of $ 1.00

b)Punitive relief in the amount of $ 77,000.00

c)Declatory judge that the acts contained in this action violate the plaintiffs rights.

d)Permenant injunction directing K.D.O.C and its Food service provider to establish and provide a fully Kosher modified diet,along with food preparation guidelines that meet jewish dietary laws.

e)Any and all other relief the court deems fit and proper.

f) A Jury trial on all issues.

G) cost of this suit.

Date: 4-03-17

_____
signature of petitioner.

Affidavit of
Deron McCoy. Jr

State of Kansas )
                )   SS
County of Butler )

I Deron McCoy. Jr being duly sworn upon oath
state the following:

1. I'M currently incarcerated at Eldorado correctional
facility in Eldorado, Ks.

2. I was previously incarcerated at Lansing correctional
facility from oct 2.2012 until June 16.2016.

3. I am a octhodox Jewish believer.

4. I want only to eat fully Kosher foods and meals
that meet all strict Hebrew dietary laws.

5. I'm sincere in my octhodox Jewish beliefs.

6. On March 13. 2014 I visited the Chaplins office
at L.C.F Max.

7. During that visit I spoke with the then chaplin
Richard Dunn about getting placed on Kosher
modified diet in accordance with my religious
beliefs.

8. I was told by Chaplin Dunn that Aramack only
provided the Certified Religious Diet (CRD).

( )

Affidavit of
DeRon McCoy. Jr

State of Kansas )
                ) SS
County of Reno )


I DeRon McCoy. Jr being duly sworn upon oath state the following:

1. I am currently incarcerated at Hutchinson correctional facility. P.O Box 1568 Hutchinson Ks 67504

2. I was moved from eldorado correctional facility to (H.C.F) on 3-22-17.

3. I am currently on special management custody.

4. I have personally witnessed the service of the certified Religious diets (CRD).

5. The following is a accurate description of the service of the (CRD) at (H.C.F).

6. All meals are transported from the H.C.F Kitchen to the cellhouse. On Metal rollable carts. All the trays are transported together. (regular trays, (CRD) trays, and veg trays) the trays are stacked on top of one another.

7. The meal trays at H.C.F are color coated dark-brown for regular meal trays and gray for (CRD) meals and for veg trays, and re-usable.

9. I asked chaplin Dunn if the (CRD) was Kosher to which he replied that he "was not even allowed to say that the (CRD) was Kosher".

10. On or about March 15, 2014 I went through the serving line at L.C.F's Max Dining hall in order to observe what was served for (CRD) and how it was served. I did this during lunch service as well as service of Dinner. (CRD).

11. During the service of Lunch (CRD) I was handed a empty Dark-brown reusable plastic tray. It was similar to the plastic reusable trays used for service of regular meals only different in color. (light-brown is used for serving regular meals)

12. As I proceeded in the meal line different inmates placed different meal components onto the various sections of the Dark-brown plastic reusable trays.

13. The meal components for (CRD) were scooped from metal serving pans that were sitting in a metal "steam well" with colored plastic Laddles.

14. None of the meal components that were served for (CRD) were served in unopened, factory sealed packages (except for the margarine) and appeared to have been made from scratch.

15. None of the meal components (beside margarine) had any Kosher certification symbols on them.

16. After (CRD) meal time was complete I followed

(2)

the other inmates who had completed eating (CRD) out of the L.C.F dining hall with my tray in hand. I observed the other (CRD) inmates placing there (CRD) trays through the same dirty tray slot that I know to be the same dirty tray slot used for all the other dirty trays used for service of meals at L.C.F max.

17. As I got to the "dirty tray slot" I peeked in the "dirty tray slot" opening and I observed a inmate dumping the dirty trays left-overs into a trash can near him then placing the (CRD) trays onto the conveyor rack of the industrial dish washer.

18. I then proceeded out of the dinning hall at L.C.F max.

19. I then returned to the L.C.F max dinning hall for the dinner service of (CRD).

20. I observed the same things at dinner service of the (CRD) that were observed by myself at lunch service of the (CRD). Only with slightly different food items served. The food items for (CRD) were still not served in factory sealed unopened packages and none besides margarine had kosher certification.

21. For the next approx ten (10) days I began to ask various inmates who worked in the L.C.F max kitchens if they had observed how the (CRD) meal was stored, cooked, and where the serving pans

(3)

and serving utensils were kept at.

22. I was told basically the same information from each inmate. that the (CRD) was not cooked or prepared in the (CRD) room, that the (CRD) is prepared and cooked at the same areas as regular meals, and that the same metal serving pans that are used for service of regular meals are the same serving pans used for service of (CRD)

23. It was after the initial investigation that I filed the initial grievance.

24. I appealed the denial of that grievance all the way to the secretary of corrections.

25. I continued my investigation into proper Kosher food requirements and Hebrew dietary laws by reading and studying several books dedicated to Kosher food requirements.

26. Hebrew Kosher dietary laws can be found in the Torah (first five books of the old testament) but most are contained in the Talmud.

27. On or about Dec 5, 2014 (which could have been Nov 6, 2014) I began work, as a Clerical Engineer on the LCF Max Electrical Crew.

28. My self along with other members of the electric crew completed several work orders in the LCF Max Kitchen. While I was working on the electric crew.

29. During the several visits into the L.C.F Steak Max Kitchen to complete work orders. I took the opportunity to observe the storage of the (CRD), How the CRD was prepared, and the packages of the (CRD) meal components. With my own eyes.

30. During one of these visits to the L.C.F Max Kitchen to complete work orders (which could have been on Nov 21, 2014) I completed electrical work on the electrical coal of the "Steam Well" food warmer and turned off the power to the electrical range top in the (CRD) room at the circuit breaker.

31. During that maintenance visit the electrical crew boss was informed also about the problem with the electrical range top in the (CRD) room

32. I first made my way to the (CRD) room to determine the electrical problem with the electrical range top.

33. Once I got into the (CRD) room I immediatly looked around the (CRD) room to see what I could ascertain about the (CRD)

34. Immediatly to the upper left of the (CRD) room was a cage on the wall I looked into the cage and observed a Mixer but no other utensils in the cage.

35. There was already a Inmate I knew to be Anthony Peppers in the (CRD) room I asked him if his Job was (CRD) cook to which he replied "Yes"

(5)

36. I then asked inmate Peppers what the electrical problem was he pointed at the electrical range top and stated "its broke".

37. I then walked over to the Electrical range top to determine the electrical problem with it. From my observation I could tell that the range top had not been used in a very long time all the knobs and the shafts that the knobs are supposed to be connected to were missing rendering the range top inoperable.

38. I then relayed the information about the range top to the electric crew boss. The electric crew boss went and verified the problem and advised that the range top should be turned off at the circuit breaker to eliminate a fire hazard which me and him then both went to DO, as I had previously worked on the Kitchen Renovation electrical crew and am very familiar with all the electrical componets of the L.C.F max Kitchen.

39. I was next directed to go fix the electrical cord on the "steam well" on the serving line, I then proceeded to the serving line.

40. When I got to the serving line area I observed a "steam well" warmer turned over so that the electrical wires underneath were visable. As I got all the way up to the "steam well" I observed cockroaches crawling all over the "steam well" from underneath the "steam well", as well as what appeared to be cockroach excrement and leftover food particles.

[16]

41. I ascertained that the "steam well" in question
was the same "steam well" referenced by me
in paragraph 13 and was the only "steam well"
"steam well" located in the serving line room.

42. I proceeded to fix the electrical power cord to
the "steam well" in question. Once I was finished
a African American Aramark worker with dread locks
checked to make sure the "steam well" warmer
was operable by having the inmates near by
put water in the "steam well" and then it on.
The "steam well" did work after I fixed it.

43. I then waited a few seconds to see if the
Aramark Staff mentioned was going to have
the inmates properly clean it before use for
serving. When I ascertain that no such directive
was forth coming. I then asked the aramark
Staff if he was going to have the inmates
or he himself clean the "steam well". To which he
replied "No" I then stated "Man theres roaches
all over it though". He just shrugged his
shoulders and directed the inmates to set the
"steam well" up for service of (CRO).

44. I then observed the mention Aramark Staff walk
over to a multi purpose use steel table and
grab several different color plastic food scoops
off the steel table. I was able to ascertain that
the food scoops that he picked up were the same
as the scoops mentioned by me in paragraph 13 used for (CRO

45. Food scoops used for regular meals are metal.

(21)

46. I then proceeded back to the area where the electric crew boss was. He was busy talking so I took the opportunity to continue to look around.

47. I noticed a inmate stirring food in a large "steam kettle". I walked over to him and asked him if one of the steam kettles was used to prepare (CRD). The inmate pointed to the right of the "steam kettle" he was at, to another steam kettle approx 2-3 ft away. The steam kettle he pointed at was approx 2-3 ft away from the grill and deep fryers. (see exhibit 5A)

48. Aramark inmate cooks prepare various pork products (pork chops & bacon), and shellfish (shrimp) on the grill and deep fryers as well as other Non-Kosher foods on the grill and deep fryer mention in paragraph 47.

49. I then walked over to a inmate I knew to be Antwan Peppers who was cutting up white turkey for Gluten free meals (which I determined from him placing the turkey meat into two styrofoam trays marked Gluten free). He was doing this on steel table located directly outside the (CRD) room. I then asked him where were (CRD) meals prepared. He then pointed down at the tables he was cutting up the turkey on and replied "here but there already done".

50. I then observed a big brown cardboard box that was opened with a loaf of white sliced bread sitting directly beside the box.

(8)

51. I was able to identify that the white sliced bread was the same white sliced bread used for (CRD) from the clear plastic package the loafs were in. Where the same package type of loafs that I had observed white going through (CRD) meal line. Plus due to the fact that regular meals are only served homemade rolls and not sliced bread.

52. I then began to closely inspect the open card board box. I observed several loafs of unopened sliced white bread inside the box. The loafs were the same see through (clear) plastic package as the one laying beside the box.

53. The loafs themselve had no kosher symbols or markings or any labels at all.

54. I then began to inspect the outside of the box. The box had no kosher symbols or markings and only had a brand name in red with no Nutritional facts affixed.

55. I then re-joined the electric crew and I left the LCF max kitchen along with the other members of the electric crew.

56. On December 12, 2014 the electric crew was once again called to the LCF max kitchen in order to fix a circuit board sensor that was shooting sparks out of it (this sensor was located near the steam kettles)

57. While the Electric Crew boss determined the Electrical problem with the sensor, I once again took the oppurtunity to look around the LCF Max Kitchen and investigate the (CRD).

58. I once again observed a inmate I knew to be Anthwan Peppers, in the (CRD) room so I walked over to the (CRD) room.

59. I asked inmate Peppers if he could show me what the package of the Main entree used for (CRD) looked like. He told me that (CRD) had "already been cooked". I replied that I was really only interested in seeing the package of the (CRD) main entree.

60. inmate Peppers then reached into a trash can near him and grabbed a clear plastic empty package out of it and held it out for me to inspect.

61. I then began to closely inspect the clear empty package. The package was appox 8 inches by 10 inches, I estimate. The clear empty package had no Kosher Symbols or Kosher Certification affixed to it. The clear empty package, had only the words "Beef Stroganoff" written across it in what appeared to be red Marker and nothing else.

62. I then asked inmate Peppers if all the other (CRD) Main entrees were marked the same and if any had additional markings or labels. He replied that all the (CRD) Main entrees packages looked the same way as the one he was holding only some

(10)

had different writting on them identifying the contents of the clear ~~there~~ plastic packages.

63. I then asked him if he could show me where it was that they kept the serving pans used for (CRD). To which he ~~so~~ replied "right out here" while exiting the (CRD) and turning to his right (my left) to the area directly by the pots and pans area where a rack of metal serving pans were stack on top of one another and pointed at stacks of metal serving pans.

64. I know this stack of metal serving pans to be the same stack of metal serving pans to be the same ones used for serving regular meals.

65. I then thanked inmate Peppers and returned to the area the Electric crew was ~~at~~ and exited the LCF max kitchen with them.

66. I have previously held the position of kosher cook for Aramark during the years of 2004-2005 (while serving a prior sentence) at LCF max

67. I recall clearly what the Job duties of a kosher cook were and what foods where served and how the kosher meals were prepared.

68. During the time I was a kosher cook for Aramark. For kosher meals only pre-packaged kosher TV dinners were served. They were stored cooked and served Sealed.

(11)

69. The Attached Exhibits "A11-A13" are the Kosher Diet Menu and General Kosher procedure used During the time I was a kosher cook for Aramark at LCF max Kitchen. (2004-2005).

70. I have previously held the position of Electrical Engineer for the Kitchen Renovation that was done. I held that position from 2006-2007.

71. The main break area for for the Kitchen Reno Electric Crew was in the basement of the LCF max Kitchen and was where we kept all tool Carts.

72. During the times I worked for Aramark I personally participated in deep cleaning to prepare the LCF max Kitchen for inspection. every time a inspection was coming Aramark staff were Notified ahead of time and would relay to the inmates that we had inspection coming and needed to deep clean so the LCF Max Kitchen could pass inspection.

73. During the time I held the position of Electrical Engineer for the Kitchen Reno 2006-2007 I observed this same procedure for preparing for inspection of the LCF max Kitchen.

74. The Attached exhibit "B1-B(5)" is a accurate representation of the areas of the max Kitchen at LCF.

75. The Attached exhibit "C" is a memo circulated

(12)

put out by defendant Patricia Berry sent to the "facility Food Secure contacts Warden" its Dated Nov 22, 2011, it states that "the tentative date for implementation of the FY 2011 Full-winter menu is thursday Jan 5, 2012". It further states that the religious meal menu -changes would include-" Changing from pre-packaged meals to meals made from scratch" as well as cutting various other changes of the religious meal menu.

76. Since being housed at Eldorado correctional facility I have observed the serving of the (CRD) meals.

77. The (CRD) meals at (E.d.c.F) ~~and~~ are transported from the (E.d.c.F) special Management Cellhouses in the same industrial size food warmer as the regular meals. Once the food warmer containing the (CRD) meal trays and the regular meal trays get to the cellhouses. A C.O takes a plastic cart out to the hallway and places the (CRD) meal trays and regular trays onto the cart. The (CRD) trays at E.d.c.F are Light-brown plastic stackable reusable trays as opposed to dark-brown plastic stackable reusable trays used for regular meals.

78. The same meal components served for (CRD) at E.d.c.F are the same meal components served for (CRD) at L.c.F.

79. After ~~th~~ C.O places the (CRD) and regular meal trays onto ~~the~~ a plastic cart he/she then hands out the meal trays in accordance to the what diet the inmate is on. The ~~stackable~~ trays are stacked on top of one another usually with (CRD) on top or bottom of the regular meal trays. There is no seperation of trays.

(17)

80. Once meal time is done a C.O. then comes and gets each tray from the inmates veg.regular and LCRD trays then stacks them all together on the plastic cart. then the C.O. takes them out to the cellhouse hullway and places them all in the food warmer. Where they sit until two inmates and a Aramark sedoo worker comes to get the food warmer and pushes it back to the Adult Kitchen.

81. The (CRD) meals a EDCF are not pre-packaged meals and have no Kosher symbols or Kosher certification. The (CRD) is served exactly as it is at LCF

82. The Attached Exhibit "D" is Attachment A from IMPP - 10-110D it clearly states that the dietary requirement for Judaism, H.O.Y and A.O.Y are Kosher dietary requirements.

Further affiant saith not.

DeRon McCoy Jr #76894
DeRon McCoy, Jr#76894

Subscribed and sworn before me, the undersigned on this 15th day of March, 2017

NOTARY PUBLIC - State of Kansas
ALLISON AUSTIN
My Appt. Expires 4-14-18

Notary Public

(14)

Exhibit "A"

Kosher diet menu
2000 - 2006



# KOSHER DIET MENU

The Kosher Diet menu provides more than 2900 calories plus adequate levels of protein, vitamins, and minerals. The plan is described below:

**Breakfast**
*For all breakfasts*

| | |
|---|---|
| fresh fruit | 1 each |
| juice drink | 4 oz |
| dry cereal | 2 cups |
| milk | 2 cups |
| margarine | |
| sugar | 3 |
| coffee | |

*Rotating breakfast entrees* (cooked in Kosher dairy pans)
1. hard cooked eggs with toast and jelly
2. scrambled eggs with toast and jelly
3. French toast with syrup
4. bagel, cream cheese, toast and jelly

**Lunch and Dinner**
*For all lunches and dinners*

| | |
|---|---|
| fresh fruit | 1 each |
| salad with non dairy dressing as on regular menu | |
| beverages | as on regular menu |
| bread | 3 |
| margarine | |

*Rotating lunch and dinner entrees (individual packaged)*
1. beef
2. chicken
3. turkey
4. fish
5. pasta

Exhibit "A(1)"

ARAMARK /Kansas DOC          Revised 10/00, 8/01                    23



## GENERAL KOSHER PROCEDURES

**Breakfast Menu**

Cold Tray:

| | |
|---|---|
| Whole Fresh Fruit | 1 ea. |
| Juice Drink | 4 oz. |
| Dry Cereal | 2 cups – disposable bowl w/lid |
| Milk | 2 cups |
| Margarine | 2 pats – sealed-type (e.g. Country Crock) |
| Sugar | 3 @ |
| Disposable Plasticware | 1 @ |

<u>Wrap fruit, bowls of cereal, bread, margarine, sugar, plasticware & napkin together on a disposable plate.</u>

Hot Tray:

Choose from the following:

1. Hard cooked eggs – 2 @, jelly – 2 @
2. Scrambled eggs (made from fresh – 2 @, jelly – 2 @
3. French toast (made from 1 fresh egg + ½ c milk + 2 bread), diet syrup – 2 @
4. Bagel, cream cheese – 1 oz, jelly – 2 @

These foods are prepared in kosher dairy pans (kept in manager's office).

How to:

Hard Cooked Eggs

Place fresh eggs (2 @/inmate) in kosher saucepan. Add water. Cover tightly with foil. Place in steamer. Cook. Place on disposable plate. Wrap in plastic wrap.

Scrambled Eggs

Crack 2 eggs/inmate into a disposable bowl. Add water (2 Tbs. inmate). Blend with disposable fork. In kosher fry pan, melt 2 pats kosher (e.g. Country Crock) margarine. Place pan on grill or hot top. Pour 1 portion of egg mix. Using kosher pancake turner, sauté eggs until thoroughly cooked. <u>Place on disposable plate. Wrap in plastic wrap. Serve hot.</u>

French Toast

Crack 1 egg/inmate into a disposable bowl. Add milk (1/2 cup/inmate). Blend w/disposable fork. Soak bread in egg mix. In kosher fry pan, melt 2 pats kosher (e.g. Country Crock) margarine. Place pan on grill or hot top. Place soaked bread slices in fry pan. Using kosher pancake turner, cook through and brown on both sides. <u>Place on disposable plate. Wrap in plastic wrap. Serve hot.</u>

Exhibit " A(2)"

## GENERAL KOSHER PROCEDURES

**Lunch & Dinner Menu**

Cold Tray:

| | |
|---|---|
| Whole Fresh Fruit | 1 ea. |
| Bread | 3 @ (non-dairy ingredients) |
| Salad: | |

Salad greens must be torn – not cut with a knife (gloved hands).  Do not add items like diced carrots or celery.  These items must be cut with a kosher knife if served to kosher diets.  Use a plastic wrap covered cutting board to assemble salad.  Serve in a disposable bowl.  Top with 2 Tbs. non-dairy dressing – pre-made.  Use a disposable spoon or cup to transfer dressing from container to salad. Use a hand grater to prepare cabbage and carrots for salads.

| | |
|---|---|
| Beverage | 1 cup |
| Margarine | 2 pats – sealed-type (e.g. Country Crock) |
| Disposable Plasticware | 1 @ |

**Wrap fruit, bowl of salad, bread, margarine, plasticware & napkin together on a disposable plate.**

Hot Tray:

Choose a pre-packaged kosher meal per the kosher cycle menu.  Pre-packaged kosher meals must be stored, cooked, and served sealed.  Do not use meals that are unsealed.

## CARE OF KOSHER PANS AND UTENSILS

In conjunction with KDOC's religious advisors, the following guidelines are given to maintain kosher pans and utensils:  All pans and utensils designated kosher shall be washed separately from other pans and utensils in COLD WATER with detergent and disposable paper toweling.  The pans and utensils shall be sanitized with an acceptable sanitizing solution mixed in COLD WATER for 1 minute.  All such pans and utensils shall be stored separately.

Suggested pans and utensils include:

- Skillet (Electric skillet for breakfast items if range top unavailable)
- Spatula
- Grater for coleslaw and carrot salad

Exhibit "A(3)"

Exhibit "B(1)" - "B(5)"
Areas of the LCF
Max Kitchen

Exhibit-B(1)- Main Kitchen Area - LCF Max Kitchen



Exhibit-B(2)- Serving Line - L.C.F - Max Kitchen



Exhibit - B(3) - dishwashing area - L.C.F Max Kitchen

way to Large dry Storage
Walk through Freezer and
Walk through cold Storage

Electrical Room

Small Dry Storage

Way to
Main Kitchen area

Way to
Dock

Way to
the Basement

Dry storage

Shelfs

Shelfs

Walk
through
Freezer

Walk
through
cold Storage
"Cooler"

way to back door
door area

↓

Exhibit - B(5) - Dry storage - Freezer - coldstorage Areas

Exhibit "C"

Memo circulated by
Defendant Beccu



Landon State Office Building
900 SW Jackson, 4th Floor
Topeka, KS 66612

**Kansas**

Department of Corrections. .

phone: (785) 296-3317
fax: (785) 296-0014
kdocpub@doc.ks.gov
www.doc.ks.gov

Ray Roberts, Secretary of Corrections

Sam Brownback, Governor

Date:   November 22, 2011

To:   Facility Food Service Contacts
       Wardens

From:   Pat Berry, Food Service Monitor

Re:   FY2011 Fall-Winter Menu

---

The tentative date for the implementation of the FY2011 Fall-Winter menu is Thursday, January 5, 2012.

The following summarizes the changes made to this menu as agreed upon by Facilities Management and the Contractor:

Religious Meal Menu

- The current two-week cycle is changed to a five-week cycle, consistent with the regular inmate menu.
- Changing from pre-packaged meals to meals prepared from scratch.
- Fortified fruit juice was added to breakfast daily, consistent with the regular inmate menu.
- Fresh fruit was removed.
- Salads were added to achieve required nutritional standards.
- Meat products will be soy-based.

Regular Inmate Menu

- Hard-boiled eggs increased to two per week instead of only one per week.
- Pre-made meat and cheese pizza added (weeks 1, 3 & 5).
- Smoked sausage added (weeks 2, 3 & 4).

Exhibit "C"

Exhibit "D"

I.M.pp  1D-11DD w Attachment A

# KANSAS DEPARTMENT OF CORRECTIONS

| Kansas Department of Corrections | INTERNAL MANAGEMENT POLICY AND PROCEDURE | SECTION NUMBER 10-110D | PAGE NUMBER 1 of 11 |
|---|---|---|---|
| | | SUBJECT: PROGRAMS AND SERVICES:  Religious Programs | |
| Approved By: [signature] Secretary of Corrections | | Original Date Issued: 03-08-16 | |
| | | Replaces Version Issued: N/A | |
| | | CURRENT VERSION EFFECTIVE: 03-08-16 | |

| APPLICABILITY: | _ ADULT Operations Only | _ JUVENILE Operations Only | X DEPARTMENT-WIDE |
|---|---|---|---|

## POLICY STATEMENT

Offenders shall be permitted to practice a religion to which they sincerely ascribe within the limitations imposed by individual facility physical structures, staffing levels, other considerations of security, good order and discipline, consistent with consideration of costs and limited resources.   All limitations or prohibitions shall be consistent with considerations of whether the limitation or prohibition is in furtherance of a compelling government interest and is the least restrictive means of furthering that compelling governmental interest. (AO 16-2459)

## DEFINITIONS

Chaplain's/Warden's/Superintendent's Designee:   A facility staff member or volunteer designated with the responsibility to coordinate and oversee religious programs for the offender population and to advise the warden/superintendent regarding religious programming.

Communion Service:  A religious service, consisting of prayers and a sacramental rite, in which bread may be dipped lightly into fermented wine or a substitute acceptable to the religion, and consumed by the participants. Many church groups provide the bread and cup separately.

Desiccated:  Thoroughly dried out; preserved through drying.

Feathers:  Refers to such feathers as they are obtained in their natural state and shall not be inclusive of any feather or feathers that have been altered as to color.  All such religious artifacts may be possessed by offenders only so long as their natural colors are maintained.  Any feathers that have been colored in any manner shall be considered contraband, shall be seized and confiscated, and the offender possessing such artifacts may be charged with possession of contraband as provided by appropriate Kansas Administrative Regulations.

Frequent:  More than twice a calendar year.

Medallion:  A religious symbol worn around the neck, next to the body, on a chain.

Medicine Bag:  A small pouch-type container made of cloth or leather, closed with a drawstring, used to carry natural objects, such as stones, desiccated animal parts (shells, bones, feathers, claws, teeth, etc.), or herbs.

Religious Observance:  The act or practice of complying with a law, custom or ritual of one's faith.

Religious Programs Coordinator:  The person designated by the Deputy Secretary of Facilities Management responsible for the coordination and general oversight of the department's religious programs.

Exhibit "D"

<u>Scapular</u>:  A religious devotional article consisting of two (2) small square pieces of cloth joined or suspended by strings, worn across the shoulders under clothing.

## PROCEDURES

I.      **Coordination and Oversight of Religious Programs**

    A.      The Deputy Secretary of Facilities Management shall implement this policy.

        1.      A divisional staff member may be designated to serve as the Religious Programs Coordinator for the Department.

        2.      Each warden/superintendent shall designate a qualified staff member responsible to coordinate, supervise, and provide advice and recommendations regarding religious programming within the facility.

    B.      A designated Religious Programs Coordinator shall be responsible for:

        1.      Overseeing the implementation of the Department's policy with regard to religious programs and procedures to ensure offenders the opportunities to practice their faith;

        2.      Advising the wardens/superintendents or the chaplain's/warden's/superintendent's designees in the development of specific plans applicable to the facility consistent with the Department's policy; and,

        3.      Serving as a liaison with community resources to ensure the Department's policy regarding religious programs is current and consistent with the practices of religions. (AC) 5-4468

II.     **Responsibilities of Chaplain's/Warden's/Superintendent's Designee**

    A.      Each warden/superintendent shall ensure that a chaplain's/warden's/superintendent's designee is available to provide religious programming for the offender population.

        1.      The chaplain's/warden's/superintendent's designee shall be responsible for:

            a.      Coordinating religious programs in accordance with provisions of this policy and, to the extent possible, ensuring that adequate space and equipment is provided for conducting and administering religious programs and services consistent with security and custody considerations, operational needs, rehabilitation goals, and the mission of the Department; (AC) 5-4468

            b.      Advising the warden/superintendent on all issues involving religious programs and related matters; and,

            c.      To the extent possible, incorporating available and utilizing existing community resources in the provision of religious programming. (AC) 5-4468

III.    **Religious Programs Guidelines**

    A.      Offenders shall be permitted the opportunity to learn about other religious affiliations but shall not be allowed to fully engage in the practices of other religions except when a change of affiliations is requested.

        1.      Participation in or attendance at any religious services by any offender shall be on a voluntary basis.

    B.      Religious observances, services, activities, and group meetings; restrictions on attendance.

1.  Except as provided in IMPP 10-108D when food is requested and the request must be made at least 60 days prior to the event, an offender requesting a religious observance shall make the request in writing to the chaplain's/warden's/superintendent's designee, and shall ensure that the chaplain's/warden's/superintendent's designee is in receipt of the request at least 15 working days prior to the date for the observance.

    a.  When appropriate, offenders may receive an entire day off from work or programs for purposes of a religious observance (Please see procedure VI.C.2.c.).

2.  Offenders shall seek the recommendation of the chaplain's/warden's/superintendent's designee and authorization and approval from the warden/superintendent or designee before two (2) or more offenders can form and meet as a group and hold religious services together.

    a.  **ADULT:** In accordance with K.A.R. 44-12-325.

    b.  **JUVENILE:** In accordance with K.A.R. 123-12-325.

3.  Offenders shall not be permitted to form or meet in a group to hold religious services if such a group would likely threaten facility security by causing affiliations to be established among the group of offenders that would incite challenges to prison authority or conflicts with other offenders.

4.  Religious observances and/or services shall not be held or scheduled at the times or with the frequency chosen by the offenders or mandated by the religion if those times conflict with the facility security, operational and management needs or would otherwise disrupt the order of the facility.

5.  When religious observances and/or services are held or scheduled at the times chosen by the offenders or mandated by the religion, all offenders who are members of the religion shall be permitted to attend such observances or services, except when:

    a.  Allowing the offender to attend is incompatible with his or her custody and security classification status;

    b.  The offender is assigned at that time to a work detail that is essential to the operation of the facility; and/or,

    c.  The offender is assigned at that time to a work detail or program the purpose of which is to promote rehabilitation by providing education, simulating societal working conditions, or fulfilling the requirements of program agreement.

6.  Offenders of all incentive levels may attend religious activities other than those where the primary intent is social in nature. Those events which are determined to be primarily social in nature may be attended only by offenders at Incentive Level III, unless the event is recognized as a tenet of the religion, in which case Level I and Level II offenders may also attend.

7.  Religious group meetings or religious services may be conducted in or restricted to a part of the facility other than the chapel or any other requested location if security and order or other operational interest, would be better served elsewhere in the facility. Facility staff may supervise or monitor the meetings or services to maintain security and order.

8.  Special facilities that are essential to the worship or ceremonies of a particular religion shall be provided, subject to the limitations established in Section VI.C.2. of this IMPP.

9.  **ADULT:** Wichita Work Release offenders, as interest is expressed, may generally be permitted to attend religious services in the community.

a.   Work release participants who wish to participate in religious services or activities may be permitted to attend services of religious denominations available within the community in which the facility is located.

    (1)   The warden shall permit work release participants to leave the facility for religious practices as an extension of confinement unless chaplaincy services are available on the premises.

10.   All proposed restrictions to accommodation shall be subject to the criteria set forth at Section VI.A.1.(a)-(d), below.

C.   Visitation or conducting of religious services by clergy or other representatives of the religion.

1.   Visitation shall be permitted by clergy to conduct religious services or lead religious group meetings that are otherwise permitted in a manner consistent with and as authorized by the facility's general orders.

    a.   **ADULT:** In accordance with K.A.R. 44-7-113.

2.   A reasonable attempt shall be made to make clergy or other representatives of all religious groups, including religious volunteers, available and accessible to offenders.

    a.   Clergy or other representatives of a religion may be required to demonstrate some type of credentials according to the standards established for that purpose by the religion in question.

3.   Clergy shall be subject to the same visitation policies and security restrictions as are all other visitors to the facility. This shall not be construed to mean that clergy are required to be on visiting lists.

    a.   **ADULT:** In accordance with K.A.R. 44-7-104, IMPPs 10-113 and 12-115.

    b.   **JUVENILE:** In accordance with K.A.R. 123-5-505.

D.   Availability, possession, and use of religious items/property.

1.   The chaplain's/warden's/superintendent's designee shall be responsible to approve religious articles permitted per IMPP 10-110D through a special purchase order from an approved vendor that is purchased or donated through an approved source.

    a.   **ADULT:** The specifications, quantity and value of such articles of property shall be governed by IMPP 12-120.

2.   Offenders shall generally be allowed to possess a bible or other primary text of their religion that shall be provided to them, upon their request subject to availability

    a.   **ADULT:** As required by K.S.A. 75-5223 and K.A.R. 44-7-113.

3.   No religious items shall be provided to offenders at State expense.

    a.   Items intended for religious group use that are donated, if approved by the warden/superintendent or designee and may be checked out to offenders, but these items remain the property of the facility.

    b   Donors must provide delivery of the donated items to the facility or other location designated by the warden/superintendent.  State vehicles shall not be employed to transport or deliver donated items from the donor to the facility.

4.  The use or possession of religious items may be limited to use or possession by clergy during visits, religious services or ceremonies.

    a.  **ADULT:**  Other than those authorized per IMPP 12-120.

5.  Fermented wine for use in communion services may be authorized by the warden/superintendent or designee.

6.  The use or possession of religious items may be limited to religious services, supervised activities, ceremonies, or prayers that the offender is allowed to conduct privately in his or her assigned living area, room or cell, with the items being unavailable to the offenders inmates at all other times.

    a.  **ADULT:**  Other than those authorized per IMPP 12-120.

7.  Commensurate with legitimate concerns for order, rehabilitation goals, the mission of the Department, and/or maintenance of security, offenders shall not be allowed to possess any religious items other than a religious medallion or scapula, and such other items as are referenced under allowable personal property referenced in Attachments A or B.

    a.  **ADULT:**  Specifically allowed by IMPP 12-120.

8.  Other items are prohibited consistent with the principle of tempering the accommodation of religious requirements with the effective acknowledgement of legitimate security concerns.

9.  Legitimate concerns for order or security include but are not limited to:

    a.  Proper utilization of available space;

    b.  Safety from fire and other physical hazards;

    c.  Dangerousness of the item, including its potential for use as a weapon; or,

    d.  The item's value or attractiveness encourages conflicts or theft.

10.  When items are confiscated, the chaplain is consulted as to their religious significance.

E.  Religious attire, including clothing, jewelry, and other ornaments, and head garments.

1.  All religious medallions and scapulars shall be worn around the neck, inside the shirt.

2.  Medicine bags shall be worn around the neck inside the shirt, or carried in a pocket.

3.  Yarmulkes, koofi and tams may be worn at all times.

4.  Offenders shall not be permitted to wear religious attire, including clothing, jewelry or other ornaments, or head garments unless the prohibition against the particular attire is not based on legitimate concerns for order, security, and hygiene. The prohibition must be defensible in terms of criteria set forth at Section VI.A.1.(a)-(d), below, in balancing the desired accommodation of religious practice against legitimate security interests.

    a.  **ADULT:**  That is not otherwise allowed by IMPP 12-127 or general orders of the facility.

5.  Legitimate concerns for order, security, and hygiene include but are not limited to:

    a.  The interference of the attire with the ability to properly identify the offender at all times;

b.   The interference with the ability to identify the offender's job or living unit assignment to the extent that the job or living areas are reflected by the clothing or head garment the offender is required to wear;

c.   The possibility that the attire can be used to hide weapons and other contraband; or,

d.   Whether permission to wear the attire could cause conflict as a special privilege allowed only for a certain group of offenders.

6.   The wearing of religious attire may be limited to private prayer in the offender's assigned living area, room or cell, religious services, or ceremonies.

a.   **ADULT:** Other than that authorized per IMPP 12-120.

F.   Hair, including facial hair, appearance or grooming requirements.

1.   Offenders may be subject to grooming requirements that require certain haircuts and removal of facial hair upon admission or that prohibit the growing of long hair or facial hair, unless the restrictions or prohibitions are not founded on legitimate concerns for order, security, or hygiene.  The prohibition must be defensible in terms of criteria set forth at Section VI.A.1.(a)-(d), below, in balancing the desired accommodation of religious practice against legitimate security interests.

a.   **ADULT:**  Established pursuant to IMPPs 12-129 and 12-131 and by the general orders of the facility.

2.   Legitimate concerns for order, security, or hygiene include but are not limited to:

a.   The interference of long hair or facial hair with the ability to properly identify offenders at all times;

b.   The interference of long hair or facial hair with offenders' personal hygiene;

c.   The interference of long hair or facial hair with safety, because it could present a hazard in the operation of machinery, the use of chemicals, or in other work or program assignments;

d.   The possibility that weapons or other contraband could be hidden in long hair or facial hair; or,

e.   The identification of a particular style of hair or facial hair with any unauthorized prison group.

G.   Religious diets.

1.   Offenders may be provided with a diet required by their religion and that provides adequate nutrition.

2.   An offender who requests an accommodation in the form of a religious diet shall not be entitled to dictate the form in which the diet is provided if the diet requirements of the religion or religious beliefs, including the diet requirements for religious holidays, and the nutritional needs of the offender are met by the diet.

3.   The Department or facility may choose whether to establish cooking and dining areas and equipment that enable the proper preparation and consumption of the religious diet at the facility or to utilize food prepared outside of the facility in order to accommodate the request for the religious diet.

4.  An offender whose request for a religious diet has been accommodated may be denied continued access to the diet if he or she consistently consumes meals from the facility meal line that are inconsistent with the approved religious diet, per IMPP 10-119D.

   a.  Offenders approved for a modified diet for religious reasons shall be served at each meal with the modified diet meal prepared by food service.

   b.  Such offenders shall not have the option of eating from the regular menu during the period the individual is placed on the modified diet list, unless and until that offender inmate submits a request to the chaplain or designee regarding a desire to terminate the modified diet.

   c.  Offenders who are removed or who elect to withdraw from the modified diet may request readmission to the modified diet program in concert with the applicable provisions of IMPP 10-119D.

## IV.  Establishment and Change of Religious Affiliation

A.  Each offender shall complete a Religious Information Form (Attachment C,) upon admission to Departmental custody.

   1.  If the Religious Information Form is not in the offender's Unit Team file upon inter-facility transfer, the offender shall be given an opportunity to complete the form at the receiving facility.

B.  Offenders may request a change of religious affiliation by submitting a Change of Religion Request form (Attachment D) to the chaplain's/warden's/superintendent's designee.

C.  A copy of the request to change religions shall be placed in the offender's master file and unit team file.

D.  Subsequent requests to change religious affiliation, or, to return to the original religious affiliation shall be documented and achieved through the above procedure.

   1.  The frequent change of religions, purely to have privileges under the claim of First Amendment Rights, shall be deemed a manipulation of the religious program and special privileges shall not be afforded to offender's seeking frequent changes.

## V.  Requesting the Accommodation of Religious Practices

A.  An offender may request that the Department accommodate a particular practice of his/ her religion that involves an exception to or requires specific authorization under existing rules and regulations, policies and procedures, general orders, or other written mandates of the Department or the facility.

B.  An offender who desires to request an accommodation of a religious practice shall comply with the following procedures:

   1.  The offender shall complete the Request for Accommodation of Religious Practices Form (Attachment E) by providing the following information:

      a.  Information about the religion or religious belief itself;

      b.  Information regarding or verifying the offender's claim of sincere adherence to the religion or religious belief;

      c.  Information regarding the particular sect, if any, of the religion to which the offender claims sincere adherence;

    d.     Information about the practice for which accommodation is sought: and,

    e.     The offender's good faith suggestions for accommodation of the request which do not conflict or infringe upon the legitimate security, good order, and discipline interests of the facility.

2.    The completed request form shall be submitted to the chaplain's/warden's/ superintendent's designee, who will conduct any necessary inquiry or investigation into the matter and within 14 working days of receipt of the form from the offender, furnish pertinent information in writing to the Religious Programs Coordinator.

    a.     Even if the particular request for accommodation has been previously approved within KDOC, the request for accommodation shall be forwarded to the Religious Programs Coordinator for review, who shall, at a minimum, confirm that the particular request has been previously accommodated at another facility within KDOC, and in what manner and under what circumstances.

    b.     The Religious Programs Coordinator shall research the request as deemed necessary by the Coordinator and inform the chaplain's/warden's/superintendent's designee once the information is received.  Once a recommendation has been made, the Religious Programs Coordinator will inform the chaplain's/warden's/ superintendent's designee regarding any additional processing which may be required.

    c.     The Religious Programs Coordinator may inquire of the offender seeking the accommodation, contact clergy or other representatives or practitioners of the religion, consult with Departmental contract religious advisors when appropriate, consult any texts of or other reliable writings about the religion, or conduct any other investigation necessary to determine the factual background of the request, and to make a recommendation as to whether and how the request should be accommodated.

3.    Within three (3) working days of completion, the recommendation and the completed form shall be forwarded by the Religious Programs Coordinator to the warden/superintendent or designee with the reasons for the recommendation attached.

4.    The warden/superintendent shall make the final determination to grant or deny the request, using the criteria set forth in Sec. VI. below,  and shall notify the offender, the chaplain's/warden's/superintendent's designee, and the Religious Programs Coordinator of the decision and the reason(s) for it within 14 working days of receipt of the completed request form and written recommendations.

5.    The offender may utilize the grievance procedure to appeal the warden's/superintendent's decision if the offender finds it unacceptable.

## VI.    Determination to Accommodate Inmate Requests [ACI 4-4459]

A.    Requests for accommodation of certain religious practices and observances shall be considered from offenders who provide sufficient evidence of their belief and affiliation with the religion.

1.    All requests for accommodation of religious practices shall be treated equally regardless of the religion involved.

    a.     Equal, consistent treatment of all religions or religious beliefs, shall not always require the same accommodations of the same religious practices in all facilities or for all offenders.

B.    The determination to be made when an offender requests an accommodation of a religious practice shall be whether any existing restriction on the practice or any justification offered for

denial of the practice is in furtherance of a compelling correctional interest, and is the least restrictive means of furthering that compelling correctional interest.

C.     A claimed religion or religious belief is entitled consideration for accommodation if it:

    1.     Has an established historical or organizational foundation; or,

    2.     Occupies a place in the lives of its claimed adherents that is parallel to that of more conventional religions, rather than a personal philosophy.

    3.     The determination shall be made, in accordance with the procedure outlined above, when an offender seeks recognition of a set of beliefs or religion by the Department or facility. Some factors that may be taken into consideration in making the determination include the following:

        a.     The history or origin of the religion or religious beliefs, including when, where, and by whom it was founded or established;

        b.     Whether the religion is organized, or has established or formed churches, temples, synagogues, or other facilities or groups for the purpose of practicing the religion;

        c.     Where unconventional or uncommon, whether it can be confirmed that the offender's set of beliefs or religion plays the same role in the offender's spiritual life as more conventional religions or religious beliefs play in the lives of their practitioners; and,

        d.     The relationship between the accommodation and the religious belief or beliefs.

D.     All requests for accommodation of religious practices shall be treated equally regardless of the religion involved.

    1.     The determination to be made shall not be whether the chaplain's/warden's/ superintendent's designee or the warden/superintendent approves of the religious beliefs or religion to which the offender claims to adhere, but:

        a.     Whether the claimed religion or beliefs are entitled to recognition pursuant to subsection C., above; and,

        b.     Whether the manner in which the offender seeks to practice the religion or exercise the beliefs will disrupt departmental and facility practices, policies, or operations that are founded on concerns for security, safety, rehabilitation, or sound correctional management.

    2.     Equal, consistent treatment of all religions or religious beliefs shall not always require the same accommodations of the same religious practices in all facilities or for all offenders.

        a.     The nature of a particular facility, including the physical limitations, the custody level(s) and security classification status of the offender housed there, and the correctional goals sought to be met there may be taken into consideration in determining whether to allow a particular religious practice at the facility.

        b.     Some factors that may justify the restriction of certain religious practices for which accommodation is sought at particular facilities include, but are not limited to the following:

            (1)     A facility may simply not have the physical capacity to accommodate the type of religious practice for which permission is sought.

(2)    While some offenders may be entitled, by virtue of their behavior records, the passage of their term(s) of incarceration, or other legitimate classification criteria, to be classified at a custody level that allows them to live at a facility where security and operational needs do not preclude the accommodation of particular religious practices, those practices might appropriately be prohibited or restricted at a different facility.

c.    The correctional goals of a particular facility may be more significantly impeded by a particular accommodation than would those of a different facility.

(1)    A facility where the goal is to provide and require meaningful work assignments for the offender population might appropriately refuse to excuse offenders from a work detail temporarily to attend religious services or for the full work day on the observance of a religious holiday; while,

(2)    Such a restriction may be inappropriate at a facility where the facility operations are not significantly impacted and the offenders are not similarly otherwise occupied.

E.    Requests for accommodation of certain religious practices shall be considered only from offenders who are actual members or adherents to their religious beliefs or in their affiliation with the religion.

1.    Some factors that may be considered, but are not pivotal, in making the determination about the inmate's affiliation include:

a.    Whether the offender indicated membership in or affiliation with the religion upon admission or has a verifiable history of such affiliation;

b.    Whether the offender qualifies for membership in the religion according to the religion's own criteria for membership;

c.    Whether the offender is familiar with the primary written text(s), if any, of the religion; and,

d.    Whether the offender has changed religious affiliations and how often.

**NOTE:** The policy and procedures set forth herein are intended to establish directives and guidelines for staff and offenders and those entities that are contractually bound to adhere to them. They are not intended to establish State created liberty interests for employees or offenders, or an independent duty owed by the Department of Corrections to employees, offenders, or third parties. Similarly, those references to the standards of various accrediting entities as may be contained within this document are included solely to manifest the commonality of purpose and direction as shared by the content of the document and the content of the referenced standards. Any such references within this document neither imply accredited status by a Departmental facility or organizational unit, nor indicate compliance with the standards so cited. The policy and procedures contained within this document are intended to be compliant with all applicable statutes and/or regulatory requirements of the Federal Government and the state of Kansas. This policy and procedure is not intended to establish or create new constitutional rights or to enlarge or expand upon existing constitutional rights or duties.

**REPORTS REQUIRED**

None.

**REFERENCES**

K.S.A. 75-5223
K.A.R. 44-7-104, 44-7-113, 44-12-325; 123-12-325, 123-5-505

IMPP 10-113, 10-119D, 11-101,12-103, 12-115, 12-120, 12-129, 12-131
ACI 3-4458, 3-4459, 3-4462

## ATTACHMENTS

| Attachment | Title of Attachment | Page Total |
|---|---|---|
| A | Reference Table of Religious Tenets | 4 pages |
| B | Instructional Material Concerning Native American Religious Artifacts | 1 page |
| C | Religious Information form | 1 page |
| D | Change of Religion Request form | 1 page |
| E | Request for Accommodations of Religious Practices form | 2 pages |

## REFERENCE TABLE OF RELIGIOUS TENETS

| Religious Group (all levels) | Primary Text (all levels) | Dietary Requirement (all levels) | Artifacts Personal Possessions (all levels) | Medallions (Worn inside the shirt) (all levels) | Holidays (all levels) | Purification Ritual (all levels) | Artifacts Group Worship (all levels) |
|---|---|---|---|---|---|---|---|
| Asatru/ Odinist Worship weekly | The Poetic Edda | | Runes/Bead/Coin | Thors Hammer | Labels, Sabbath, Yule (Dec 21) | n/a | Candle, Rune, Drinking Horn, Altar Cauldron, Evergreen Wreath with Mjolnir and Norse Gods, Thors Hammer |
| **Assembly of Yahweh** Worship on Sabbath | Sacred Name Text | Kosher | n/a | n/a | Passover, Days of Unleavened Bread, Pentecost, Feast of Weeks, Feast of Trumpets, Day of Atonement, Feast of Tabernacles | n/a | Readings |
| Buddhism Worship weekly | Tripitaka or Surtras, Texts, Sayings, Teachings of Buddha | Vegetarian | Meditation beads, pictures or medallion for Buddha, medallion mat and/or cushion | Wheel, Dharma, Status of Buddha | Dharma Day, Buddha's Birthday | Mikveh | Status of Buddha, Incense, incense burner |
| *Catholic* 1/week | Old/ New Testament (also Apocrypha for Catholic) | n/a | Rosary Scapula | Saints medal Crucifix Chain | Easter Christmas (major Christian holiday) | n/a | Communion elements Bible Large cross/crucifix Candles/holder |
| Christian Science Weekly worship | Science and Health Key to the Scripture by Mary Baker Eddy and an Old/New Testament | n/a | n/a | n/a | Christmas | n/a | Reading materials |
| **Hinduism** Weekly worship | Veta-Sruti literature | *Vegetarian* | Picture of a Hindu God, pure water | n/a | n/a | n/a | Incense, incense burner, picture of a Hindu God. |
| House of Yahweh Weekly worship | Book of Yahweh | Kosher | Kippah (black) prayer | n/a | Passover, Feast of Weeks, Feast of Trumpets, Day of Atonement, Feast of Tabernacles | n/a | n/a |

| Religious Group (all levels) | Primary Text (all levels) | Dietary Requirement (all levels) | Artifacts Personal Possessions (all levels) | Medallions (Worn inside the shirt) (all levels) | Holidays (all levels) | Purification Ritual (all levels) | Artifacts Group Worship (all levels) |
|---|---|---|---|---|---|---|---|
| Islam Jumah prayer (Fri. p.m.) | Qur'an | Non-pork Ramadan fasting | Prayer Rug Male Koofi cap (black), Female Head Scarf, Prayer beads | Crescent & Star, Islamic scriptures engraved on medallion | Eid-ul-Fitr (immediately following Ramadan) Eid-ul-Adha about 2 months following Ramadan | Must bathe within 24 hours of worship (Jumah prayer) | Qur'an Prayer Rug Male: Koofi Cap (black) Female: Head Scarf (black) |
| Jehovah Witness Weekly worship | The New World Translation of the Holy Scriptures | n/a | | n/a | Lord's Evening Meal (Memorial) | n/a | n/a |
| Judaism Worship on Sabbath (Day of rest) | Torah Tanakh Prayer books Code of Jewish Law | Kosher | Yarmulke (black) Tzi Tzit Prayer Shawl | Star of David (6-point) | Purim Passover Yom Kippur Sukkot Hanukkah Rosh Hashanah Shavuot | n/a | Rams Horn (Rosh Hashanah) Candle/holder Menorah, Tefillin, Yarmulke |
| Krishna Worship Weekly Ceremonies can Only be performed by authorized Practitioner | Vedic literature | Vegetarian | Prayer beads bead necklace | n/a | n/a | Purification at times | n/a |
| Latter Day Saints (Mormons) worship weekly –Sunday | Old/New Testament , Book of Mormon, Doctrine Covenants and the Pearl of Great Price | Abstain from nicotine/ caffeine products | n/a | n/a | Major Christian Holidays | n/a | n/a |
| Moorish Science Temple of America (MSTA) worship weekly Friday | Holy Koran by Noble Drew Ali | Non-pork Fasting if individual choice | Fez (black) (males), Turban (females) and button | n/a | January 8 – Prophet Noble Drew Ali birthday January 15 – Moorish New Year March 18 – Moorish Moorish Seniors Day July 20 – Anthony Day Some may participate in Ramadan Fridays | n/a | Flag Circle 7 Emblem Picture of prophet Picture of Convention Warrant of Authority Moorish Button |

| Religious Group (all levels) | Primary Text (all levels) | Dietary Requirement (all levels) | Artifacts Personal Possessions (all levels) | Medallions (Worn inside the shirt) (all levels) | Holidays (all levels) | Purification Ritual (all levels) | Artifacts Group Worship (all levels) |
|---|---|---|---|---|---|---|---|
| **Native American** Worship Drum Ceremony Sweat Lodge Pow Wow | Use music and storytelling (verbal tradition) | n/a | 5 neutral colored feathers, Sage, Sweetgrass, Cedar, smudging bowl, white bandana | Medicine bag | Seasonal Dances [Pow Wows] | Smudging Sweat lodge | Blankets for sweats, buffalo skull, ceremonial pipe, Dance Bells, Drum, Sweat Lodge, Tobacco, White Bandana, Medicine Wheel, Flute, sage, sweetgrass, cedar |

*The pipe keeper may keep pipe in his/her possession.



| **Protestant** Worship weekly | Old/New testament | n/a | n/a | Cross/chain | Easter, Christmas [major Christian holidays] | n/a | Communion, Communion elements, Bible, Candles/holder |
| **Rastafarian** Meet weekly for worship | Selected portions of Old/New Testament | Vegetarian | Tam (black) | Ankh medallion | July 23 [Hailie Selassie's Birthday] | n/a | Reggae music, Bongo drums, African flag, Wooden Candle stick |
| **7 Day Adventist** Saturday | Old/New Testament | Vegetarian, Non Pork | | Cross/chain | Easter, Christmas [major Christian holiday] | n/a | Communion elements, Bible |
| **Sikh** Meet weekly for worship | Peace Lagoon | Vegetarian | Turban, Large comb, Bracelet on right wrist | Khanda | n/a | n/a | |

| Religious Group (all levels) | Primary Text (all levels) | Dietary Requirement (all levels) | Artifacts Personal Possessions (all levels) | Medallions (Worn inside the shirt) (all levels) | Holidays (all levels) | Purification Ritual (all levels) | Artifacts Group Worship (all levels) |
|---|---|---|---|---|---|---|---|
| Thelemic Worship weekly | Holy Book of Thelema by Aleister Crowley or the Book of the Law | n/a | Prayer Rug Oil (4-1oz) Abramelin Stele of Revealing Electric Candle Plastic Cup Fire Wand Altar Cloth Altar Statue Pentacle Facsimile Stone Tarot Cards Virgin Paper Dragon's Blood Ink Masking Tape Calendar Personal Book of Shadows | Red-Pointed Talisman | The Rituals of the Elements and Feasts of the Times The Feast for the First Night of the Prophet and his Bride The Feast for the Three Days of the Writing of the Book of the Law The Feast for the Supreme Ritual The Feast for the Equinox of the Gods | n/a | |
| Unity Worship weekly | Old/New Testament | n/a | n/a | Christian cross | n/a | n/a | |
| Wiccan Worship weekly | Complete Book of Witchcraft by Raymond Buckland or Complete Book of Witchcraft by Buckland or Buckland's Complete Book of Witchcraft by Raymond Buckland | n/a | Book of Shadows (Cloth bound) White (tabletop) altar mount colored feathers Electric Facsimile Candle Tarot Cards Prayer rug Runes bag Altar cloth | Pentagram with two points down | Sabbats (observed at the changes of seasons) Esbats | Salt in cell | Candle holder Incense burner Salt Pentacle candle/candelabra Tarot cards Runes Altar Altar cloth Chalice |

Attachment B, IMPP  10-110D
Effective 03-08-16

## KANSAS DEPARTMENT OF CORRECTIONS
# INSTRUCTIONAL MATERIAL CONCERNING NATIVE AMERICAN RELIGIOUS ARTIFACTS

1.  Offenders may possess five (5) real, facsimile or synthetic feathers which may be beaded or decorated with materials which conform to security considerations.

2.  If, at the discretion of the warden/superintendent, offenders are permitted to make their own medicine bags, all materials shall be approved by the chaplain to ensure conformity with security considerations and specifications for medicine bags, per Section VI.

3.  Offenders may possess a cloth or leather medicine bag, not to exceed four (4) inches in diameter when laid out flat, which may be beaded or decorated with materials that conform to security considerations. The medicine bag shall be worn around the neck inside the shirt or carried in the pocket.

4.  The chaplain's/warden's/superintendent's designee shall be responsible to maintain items used by Native American Religion practitioners in cleansing, blessing and purification, and making such items available upon valid request.  Such items include, but are not limited to sage, sweet grass, cedar, and tobacco.

5.  The chaplain's/warden's/superintendent's designee shall be responsible to provide training to staff on the proper method for the inspection of a medicine bag to ensure that it is treated with dignity and respect.

    a.  Medicine bags and other religious artifacts shall be subject to inspection per provisions of KDOC IMPP 12-103/JJA IMPP 12-103.  A staff member may direct an offender to open his/her medicine bag for a visual inspection, or may require an inmate to allow the inspection of any other religious artifact.

    b.  Ordinarily the offender should handle the bag or other religious artifact at all times and neither the bag nor its contents, nor any other religious artifact, should be touched by the staff member.

    c.  If there are questions or problems regarding the inspection of a medicine bag or other religious artifact, the staff member shall confiscate the bag or other religious artifact and, with an evidence card attached, place the bag or other religious artifact in a secured location as evidence.

    d.  To ensure that religious artifacts are treated with respect by the examining staff, the chaplain's/ warden's/superintendent's designee shall be present when a medicine bag and contents (or any other religious artifact), placed in evidence, is examined.

    e.  If a medicine bag or other religious artifact is clearly determined to contain contraband, the bag or other religious artifact loses its religious significance.

Attachment C, IMPP  10-110D
Effective 03-08-16

## KANSAS DEPARTMENT OF CORRECTIONS
# RELIGIOUS AFFILIATION INFORMATION

DATE_____

OFFENDER NAME_____NUMBER_____

PRESENT RELIGIOUS AFFILIATION:

___Asatru/Odinist          ___Assembly of Yahweh      ___Buddhist            ___Catholic

___Christian Science       ___Hinduism                ___House of Yahweh     ___Islam

__Jehovah Witness          ___Judaism                 ___Krishna             ___Mormon

___MSTA                    ___Native American         ___Christian/Protestant ___Rastafarian

___7-Day Adventist         ___Sikh                    ___Thelema             ___Unity

___Wiccan                  _____Other (_____)

NAME OF YOUR OUTSIDE RELIGIOUS GROUP:

_____

NAME OF RELIGIOUS LEADER (Priest, Pastor, Imam, Sheik, Medicine Man, etc.):

_____

ADDRESS OF RELIGIOUS LEADER:_____

                                         Number          Street

                                         City    State    Zip Code

If I decide to change my religious affiliation, I will make my request to the Pastoral Care Department.

Signed:_____     _____     _____
         Offender Name          Number          Chaplain's/Warden's/Superintendent's Designee    Date

cc:    Unit Team/Unit File
      Central File

Attachment D, IMPP 10-110D
Effective 03-08-16

## KANSAS DEPARTMENT OF CORRECTIONS
## CHANGE OF RELIGION REQUEST

OFFENDER NAME_____NUMBER_____CELL_____

MOST CURRENT RELIGOUS PREFERENCE: _____

CHANGE TO RELIGIOUS PREFERENCE (Check One):

___Asatru/Odinist ___Assembly of Yahweh ___Buddhist ___Catholic

___Christian Science ___Hinduism ___House of Yahweh ___Islam

___Jehovah Witness ___Judaism ___Krishna ___Mormon

___MSTA ___Native American ___Christian/Protestant ___Rastafarian

___7-Day Adventist ___Sikh ___Thelema ___Unity

___Wiccan ___Other(_____)

Do you wish to have your name placed on all the applicable religious activities in your faith group?

_____YES _____NO

Complete the information below if there is a religious official, (Priest, Pastor, Imam, Sheik, Medicine Man, etc.), that you wish to have visit:

Name: _____

Street Address: _____

City:_____ State:_____ Zip Code:_____

Offender's Signature: _____

Date:_____

Chaplain's/Warden's/Superintendent's Designee Signature:_____

Date: _____

Entered into OMIS/JCFS Date _____ Initials: _____

cc:     Unit Team/Unit
       Central File

## KANSAS DEPARTMENT OF CORRECTIONS
## REQUEST FOR ACCOMMODATION OF RELIGIOUS PRACTICES

Offender Last Name _____   First Name _____

Number _____   Facility_____   Date_____

1.   Faith group for which you are requesting accommodation? _____

2.   If this religion is not already listed, what is the accommodation you are requesting? _____
_____

3.   Are you officially recognized as a member of this group?   YES ___        NO ____

4.   If this religion is already listed, what is the accommodation you are now requesting?_____
_____

5.   How long have you been a member of this group? _____

6.   Please list your outside spiritual advisor:

Group Name _____

Address _____

City _____   State _____   Zip Code _____

Telephone Number _____   Contact Person_____

7.   What documentation, if any, is required to participate in this group?_____

8.   What is there that sets this group apart from others? _____

9.   Please list the National or International Offices: _____

Name of Faith group _____

Other Names it goes by _____

Street Address _____

City _____   State _____   Zip Code_____

Telephone Number _____

10.  When, Where, and Who founded this group? _____
_____

11.  How is it organized? (e.g., districts, local churches, etc.) _____
_____

12.  Where is the nearest group to the facility? _____
_____

13.  Is it your understanding that there are certain requirements before one can officially "convert" to this faith group?  If yes, please explain. _____
_____

14.    What is the name of the primary religious text of this faith group?_____
_____

15.    Who wrote the text? _____

16.    What are some related source books about the religious practices and where can these books be obtained? _____

17.    What do you consider the major beliefs or doctrines of the religion to be? _____
_____
_____

18.    What are the basic teachings of this religion? _____
_____
_____

19.    What are the historical roots of this religion? _____
_____
_____

20.    Is there a purification ritual?  If so, please describe._____
_____

21.    Are there fundamental tenets of the religion that must be practiced while one is incarcerated?_____
_____
_____

22.    What are your religious holidays?_____
_____

23.    Are there property or artifacts which are required in order to practice this religion?  If so, what? _____
_____
_____

24.    Does your religion have a religious medallion?  If so, please describe._____
_____

25.    Are there dietary standards that are required?  If so, what? _____
_____
_____

26.    Are there any special medical issues that this religion follows or prohibits?  If so, what? _____
_____

27.    Are there any requirements for worship?  If so, what? _____
_____

28.    When or how does worship occur? _____
_____

29.    Is it necessary for a congregational meeting if there are more than two people in the religion? _____
_____

30.    What other faith groups have you belonged to and when? _____
_____

8. The same trays used for veg meals are the same trays used for service of (CRD).

9. Once one or two ~~or~~ (C.O's) ~~places the trays~~ ~~on the rollable metal cart the conveyor~~ then either pushes the cart down the tier to the elevator (for service of the food to the inmates on the second tier of the cellhouse) and then hands out meal trays to each inmate in accordance with the diet they're on. Via the tray slot on each cell.

10. The same meal components that ~~(are)~~ served at L.C.F, and E.D.C.F are the same components served at H.C.F for (CRD).

11. Once meal service is done and the inmates I finished eating the (C.O's) then pick up the dirty meal trays and places the all the dirty trays ontop of one another onto the rollable metal cart ~~place them back in the ~~faster~~~~ and transports the dirty meal trays back to the H.C.F kitchen for wash and re-use

Further affiant saith not.

/S/ DeRon McCoy Jr
DeRon McCoy Jr #76894

Subscribed and sworn to before me on this 28th day of March, 2017

BRIAN A. DRINKWALTER
Notary Public · State of Kansas

Brian A. Drinkwalter