## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

DERON MCCOY, JR.,                               )
                                                )
      Plaintiff,                             )
                                                )         Case No. 5:16-cv-03027-CM-KGG
v.                                              )
                                                )
ARAMARK CORRECTIONAL                            )
SERVICES, LLC, et al.,                          )
                                                )
      Defendants.                            )


## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS ARAMARK CORRECTIONAL SERVICES, LLC, JULIE DOCKENDORFF, AND PAUL CHURCH

Defendants Aramark Correctional Services, LLC, Julie Dockendorff, and Paul Church (collectively, "Defendants"), in accordance with D. Kan. 7.1(a) and D. Kan. 7.6, submit this Memorandum in Support of their Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56. The Notice required by D. Kan. Rule 56.1(f) is also being provided herewith. Because there is no genuine issue of material fact that the certified religious meal ("CRD") menus, meal components and processes at Lansing, Hutchinson and El Dorado Correctional Facilities are kosher, and because Defendants are entitled to judgment as a matter of law, Defendants respectfully request that their motion be granted. In support thereof, Defendants state the following.

### NATURE OF THE CASE

Plaintiff is currently an inmate at El Dorado Correctional Facility ("EDCF"). (Doc. 108-1 at 2). Plaintiff filed his Third Amended Complaint ("Complaint") on June 14, 2017 against several defendants including Aramark Correctional Services ("Aramark"), Julie Dockendorff, and Paul Church (hereinafter collectively referred to as "Defendants") alleging violations under 42 U.S.C. § 1983, and violations of the Religious Land Use and Institutionalized Persons Act ("RLUIPA").

(Doc. 56). The crux of Plaintiff's complaint is that Defendants have failed to provide him with a Kosher diet in accordance with his Jewish faith. This, however, is no longer the case. Since his most recent transfer to EDCF on June 18, 2019, Plaintiff has not requested to receive any type of religious diet, including kosher meals, and has been receiving and eating without complaint non-kosher, regular meals for almost a year. (Affidavit of Chaplain Herbie Harris at ¶ 5). This undisputed fact, by itself, establishes that **Plaintiff's religious beliefs are not sincerely held** and this case must be dismissed.

The Court dismissed Plaintiff's RLUIPA claims against Defendants Dockendorff and Church in their individual capacities.  (Doc. 90). The State of Kansas previously filed a summary judgment motion on Plaintiff's claims.  In its May 12, 2020 Order, the Court found that it lacked jurisdiction over several of Plaintiff's claims because they are moot, and that the remaining claims against Defendant Berry and Defendant Allen were either unexhausted, barred by qualified immunity, or unsupported. (Doc. 175).  The Court's rulings on Plaintiff's claims equally apply to Defendants Aramark, Dockendorff, and Church, as discussed later on in this memorandum. For the reasons discussed in the Court's order and those set forth below, Defendants respectfully request that the court enter summary judgment in their favor on each of Plaintiff's claims.

### STATEMENT OF FACTS

As per D. Kan. Rule 56.1(a), the following is a concise statement of material facts as to which no genuine issue exists:

1.    Plaintiff is currently an inmate at EDCF. (*See* Doc. 108-1 at 2; Exhibit A, Affidavit of Chaplain Herbie Harris at ¶ 4 (hereinafter, "Harris Aff.")).

2.     Since Plaintiff's most recent transfer to EDCF on June 18, 2019, Plaintiff has not requested to receive any type of religious diet, including kosher meals. For nearly a year, Plaintiff has been receiving non-kosher, regular menu meals. (*See* Harris Aff. at ¶ 5).

3.     Defendant Aramark Correctional Services, LLC ("Aramark") is a food service contractor for KDOC and develops and implements menus for the foods that inmates are served at KDOC facilities, with KDOC being responsible for agreeing to and approving such menus, including the CRD menu.  (*See* Doc. 133-1 at 11 (¶ 7) and at 44-47 (KDOC Religious Meals Menu)).

4.     Aramark has policies in place to ensure the CRD is correctly implemented. These policies are periodically reviewed and approved by Aramark's religious authority, Rabbi Fellig. (*See* Doc. 133-1 at 2-3 (¶ 9), 5 (¶ 20), and 48-50 (Kosher meals and menu procedures and training document entitled, "Preparing a Kosher Environment")).

5.     Defendant Dockendorff was employed by Aramark as a dietician during the alleged events giving rise to this action, and Defendant Church is employed as a District Manager for Aramark.  (*See* Doc. 93 at 2; Doc. 58 at 9; Doc. 90 at 10).

### *Facts regarding Lansing Correctional Facility ("LCF")*

6.     Plaintiff was an inmate at LCF from October 2, 2012, to June 16, 2016. (*See* Doc. 41 (*Martinez* Report) at 2).

7.     On January 22, 2014, Plaintiff changed his religious preference from Protestant to Assembly of Yahweh. (*See* Affidavit of Don Almond, Doc. 41-2, Ex. B at ¶ 3). Plaintiff was added to the religious meals roster at that time. *Id*.

8.     On August 24, 2014, Plaintiff changed his religious preference from Assembly of Yahweh to Judaism. (*See Id*. at ¶ 5).

9.    Plaintiff was housed at LCF when he filed this lawsuit and remained there until his transfer to EDCF on June 16, 2016. (*See* Doc 175 at 10).

10.    Plaintiff ate non-kosher food/consumed non-kosher commissary items continuously throughout his incarceration. (*See* Docs. 98-7, 98-8).

11.    Evan Hitchcock is employed by Aramark as the General Manager/Regional Safety Leader at LCF. His job duties include, in part, training, managing performance, and directing and overseeing operations related to food service. (*See* Affidavit of Evan Hitchcock, at ¶¶ 2-3 (hereinafter, "Hitchcock Aff."), Doc. 133-2).

12.    The CRD menus used for male inmates in 2014 and thereafter included kosher items. (*See* Doc. 41-3).

13.    KDOC and its Religious Authority, Rabbi Friedman, were ultimately responsible for approving the CRD menus and denying any request by Plaintiff to have his kosher food served as a sealed, TV-style dinner.  (*See* Declaration of Rabbi Ben Friedman, at ¶¶ 2-4, 20 (hereinafter, "Friedman Dec."), Doc. 133-3).

14.    The CRD menus contain a signature of approval by Aramark's religious authority, Rabbi Fellig. (*See* Doc. 41-3, Ex. C at 3-7).

15.    All food used in the preparation of the CRD menu is sourced from manufacturers that use kosher manufacturing processes and Aramark maintains certificates for these food items verifying they are kosher-certified. (*See* Hitchcock Aff., at ¶¶ 18-19; Doc. 133-1 at ¶ 16(a) (Declaration of separate defendant Patricia Berry, Contract Manager for KDOC (hereinafter, "Berry Dec.")) and Ex. 2 thereto).

16.     All entrée items used in the CRD arrive at LCF factory sealed, are portioned out of bulk boxes, and are stored on separate shelving units from non-CRD food. (*See* Hitchcock Aff., at ¶¶ 20-21; Ex. 1-2 to Hitchcock Aff.).

17.     CRD entree items have kosher symbols on the outer bulk packaging. (*See* Hitchcock Aff,, at ¶ 20; Ex. 61-62 to Hitchcock Affidavit; Friedman Dec., at ¶ 7).

18.     The sliced bread and milk do not maintain kosher symbols on the individual packaging. (*See* Friedman Dec.at ¶ 7). Aramark maintains certificates verifying they are in fact kosher. *Id.* The fact that an item served on the CRD does not maintain a kosher symbol on the packaging does not mean the food is not kosher. *Id.*

19.     CRD foods are prepared with their own set of procedures, and staff are trained on those procedures by Aramark. (*See* Hitchcock Aff. at ¶¶ 45-46; Friedman Dec., at ¶ 20; Ex. 2 to Friedman Dec.).

20.     LCF maintains a separate CRD-designated room for the preparation, service, and cleaning of CRD menu items. Only authorized staff are allowed into the locked CRD-designated room. (*See* Hitchcock Aff., at ¶¶ 6-9; Ex. 10-13, 15-28 to Hitchcock Aff.*;* Friedman Dec. at ¶ 12).

21.     The CRD-designated room contains a sink in which all CRD-related items are cleaned and sanitized. (*See* Hitchcock Aff., at ¶¶ 6-9; Ex. 20, 27 to Hitchcock Aff.; Friedman Dec.at ¶ 12).

22.     Following the service of the CRD meals, CRD trays are collected, disposable utensils are discarded, and there is one tub used for collection of the dirty CRD trays after the meal. (*See* Hitchcock Aff., at ¶¶ 33-34).

23.     LCF utilizes a steam kettle and oven for the preparation of warm CRD food. (*See* Hitchcock Aff., at ¶ 27; Ex. 35-36, 39 to Hitchcock Aff.).

24.    No stovetops are used in the preparation of CRD food. (*See* Hitchcock Aff. at ¶ 25).

25.    CRD-designated trays are used for serving the CRD menu, differentiated by color. (*See* Hitchcock Aff.at ¶ 29; Ex. 24 to Hitchcock Aff.*;* Friedman Dec. at ¶ 8).

26.    CRD meal trays for general population inmates are purple. General population trays for all diets other than CRD are tan. (*See* Hitchcock Aff., at ¶ 30; Ex. 24 to Hitchcock Aff.).

27.    Disposable sporks are used for CRD meals. (*See* Hitchcock Aff.at ¶ 32; Ex. 66-67 to Hitchcock Aff.; Friedman Dec. at ¶ 8).

28.    CRD-designated utensils are used for the service of the CRD menu. These utensils are distinguishable by two holes in the handle and are kept in a locked cabinet accessible only by Aramark employees. (*See* Hitchcock Aff., at ¶¶ 10-12; Ex. 14-15 to Hitchcock Aff.; Friedman Dec., at ¶ 10).

29.    CRD-designated cookware is distinguishable by a black Teflon coating on the inside of the pan. Pans used for the regular menu food do not have the black Teflon coating. (*See* Hitchcock Aff., at ¶¶ 13-14; Ex. 32, 37 to Hitchcock Aff.; Friedman Dec., at ¶ 8).

30.    When not in use, the cookware used in preparation of the CRD is stored in the CRD-designated room. (*See* Hitchock Aff., at ¶ 15; Friedman Dec., at ¶ 8).

31.    The cookware and other CRD-designated tools are not used to prepare regular meal items. (*See* Hitchcock Aff., at ¶ 13; Friedman Dec. at ¶ 8)

32.    The CRD for general population inmates is plated on a separate area of the kitchen line. CRD food is plated and served prior to regular menu items. CRD food does not come into contact with non-CRD menu items. (*See* Hitchcock Aff., at ¶¶ 25-29; Ex. 58-60 to Hitchcock Aff.; Friedman Dec. at ¶ 18).

33.     Following service of the CRD meal, CRD-designated trays are collected and the disposable utensils are discarded. (*See* Hitchcock Aff., at ¶ 33).

34.     CRD trays are collected in a plastic tub and are taken to the CRD-designated sinks to be washed and sanitized. (*See* Hitchcock Aff., at ¶¶ 34-35).

35.     CRD meal trays for inmates in segregation are differentiated by color and stored separately from trays used for serving regular menu meals. (*See* Hitchcock Aff., at ¶ 37).

36.     Segregation meal trays for the CRD are tan/yellow. Segregation meal trays used for the other menus are brown or gray. (*See* Hitchcock Aff., at ¶ 38).

37.     CRD meals for inmates in segregation are prepared on the CRD-designated table and stacked in a separate area of the food warmer. (*See* Hitchcock Aff., at ¶¶ 39-40).

38.     The CRD has a dedicated steam table only used for service of the CRD meals. (*See Martinez* Report, Doc. 41 at 4; Affidavit of Randall Singletary, Doc. 41-6, Ex. F at ¶ 6).

39.     Menu items used in the CRD are stored separately from non-CRD food items, in separate areas of the warehouse or dry storage room. (*See Martinez* Report, Doc. 41 at 4; Hitchcock Aff.at ¶¶ 21-22; Ex. 1-2, 61 to Hitchcock Aff.*;* Affidavit of Randall Singletary, Doc. 41-6, Ex. F at ¶ 3; Friedman Dec., at ¶ 6).

40.     CRD-designated trays, cooking utensils, and pots and pans are washed and stored separately from non-CRD items. (*See* Hitchcock Aff., at ¶¶ 29, 37, 43-44; Friedman Dec., at ¶ 8).

41.     Once an inmate food service worker is assigned to assist in CRD meal preparation, he is trained in proper preparation of kosher meals. (*See* Hitchcock Aff., at ¶ 45).

42.     The training document is signed by both the inmate food service worker and the Aramark trainer. (*See* Hitchcock Aff., at ¶ 15).

43.     Separate defendant Patricia Berry is a former contract manager for KDOC.[1] Her duties included reviewing each approved menu, monitoring contract requirements, preparing and processing contract amendments, and conducting food service operation inspections. (*See* Berry Dec. at ¶¶ 2-3).

44.     Ms. Berry periodically conducted inspections of Aramark's delivery of food services at LCF, including Aramark's delivery of the CRD menu. (*See* Berry Dec., at ¶ 10).

45.     Ms. Berry's February 24, 2014, July 22, 2014, December 18, 2014, and September 30, 2015 audit inspections of LCF's food services found that the authorized menus were being used and the kitchen had appropriate kosher food preparation practices, and that pest control was evident and pest control procedure was maintained. (*See* Berry Dec., at ¶ 13).

### Facts regarding Hutchinson Correctional Facility ("HCF")

46.     Plaintiff was an inmate at HCF from March 22, 2017 to January 29, 2018. (*See* Doc. 94-1 at 3).

47.     Plaintiff applied for a religious diet at HCF but was not eligible to receive the CRD while housed at HCF because he was on a medical diet. (*See* Doc. 133-4, Declaration of Sue Stoecklein (hereinafter, "Stoecklein Dec."), at ¶ 5). Plaintiff does not allege that he consumed any CRD meals while at HCF. (Doc. 175 at 11).

48.     Plaintiff has not pursued the grievance process at HCF. (*See* Doc. 173 at 2.)

49.     Michael Buch is employed by Aramark as the Assistant Food Service Director at HCF. His job duties include, in part, training, managing performance, and directing and overseeing operations related to food service. (*See* Doc. 133-5, Affidavit of Michael Buch (hereinafter, "Buch Aff."), at ¶ 3).

---

[1] Ms. Berry retired at the end of November 2019.

50.     The CRD menus for 2017 and thereafter included kosher items. (*See* Berry Dec., at ¶¶ 16, 19 and Exhibit 5 thereto; Exhibit B, *Martinez* Report filed in *Jefferson v. Aramark Corr. Serv.,* No. 17-CV-3161-SAC-DJW, Doc. 34-4, Ex. 4 at 1-5, subject to judicial notice per Fed. R. Evid. 201, copy of cited items to be provided to Plaintiff).

51.     KDOC and its Religious Authority, Rabbi Friedman, were ultimately responsible for approving the CRD menus and denying any request by Plaintiff to have his kosher food served as a sealed, TV-style dinner.   (*See* Declaration of Rabbi Ben Friedman, at ¶¶ 2-4, 20 (hereinafter, "Friedman Dec."), Doc. 133-3).

52.     The CRD menu contains a signature of approval by Aramark's religious authority, Rabbi Fellig. (*See* Berry Dec., at ¶¶ 16, 19 and Exhibit 5 thereto; Exhibit B, *Martinez* Report filed in *Jefferson v. Aramark Corr. Serv.,* No. 17-CV-3161-SAC-DJW, Doc. 34-4, Ex. 4 at 1-5, subject to judicial notice per Fed. R. Evid. 201, copy of cited items to be provided to Plaintiff).

53.     The following provisions appear on each menu: "Follow all kosher preparation instructions in recipes for Entrees, Starches, and Salads. Utensils used for scooping, cooking and serving must be dedicated for kosher food use ONLY and stored in a special area. Serve meal on disposable or designated kosher tray with disposable or kosher only tableware." (*See Id.*)

54.     All food used in the preparation of the CRD menu is sourced from manufacturers that use kosher manufacturing processes, and Aramark maintains certificates for these food items verifying they are kosher-certified. (*See* Buch Aff., at ¶¶ 18-19).

55.     All entrée items used in the CRD arrive at HCF factory sealed, are portioned out of bulk boxes, and are stored on separate shelving units from non-CRD food. (*See* Buch Aff., at ¶ 20; Exhibit B, *Martinez* report in Case No. 17-CV-3161-SAC-DJW, Doc. 34, Ex. 109-110, 113-116).

56.     CRD entree items have kosher symbols on the outer bulk packaging. (*See* Friedman Dec., at ¶ 7; Exhibit B, *Martinez* report in Case No. 17-CV-3161-SAC-DJW, Doc. 34, Ex. 78-83).

57.     The sliced bread and milk do not have kosher symbols on the individual packaging. (*See* Friedman Dec., at ¶ 7). Aramark maintains certificates verifying they are in fact kosher. *Id.* The fact that an item served on the CRD does not maintain a kosher symbol on the packaging does not mean the food is not kosher. *Id.*

58.     CRD foods are prepared with their own set of procedures and staff are trained on those procedures by Aramark. (*See* Buch Aff., at ¶ 3; Berry Dec., at ¶ 20).

59.     HCF maintains a separate CRD-designated room for the preparation, service, and cleaning of CRD menu items. Only authorized staff are allowed into the locked CRD-designated room. (*See* Buch Aff., at ¶¶ 6-8; Exhibit B, *Martinez* report in Case No. 17-CV-3161-SAC-DJW, Doc. 34, Ex. 74-75).

60.     The CRD-designated room contains several sinks in which all CRD-related items are cleaned and sanitized. (*See* Buch Aff.at ¶ 8; Exhibit B, *Martinez* report in 17-CV-3161-SAC-DJW, Doc. 34, Ex. 68-71, 73).

61.     HCF utilizes a separate stove and oven for the preparation of warm CRD food. (*See* Buch Aff., Ex. E at ¶ 21; Exhibit B, *Martinez* report in 17-CV-3161-SAC-DJW, Doc. 34, Ex. 64-67).

62.     No steam kettles are used in the preparation of CRD food. (*See* Buch Aff.at ¶ 22).

63.     CRD-designated trays are used for serving the CRD menu, differentiated by color. (*See* Buch Aff., at ¶¶ 23-24, 30, 38; Exhibit B, *Martinez* report in 17-CV-3161-SAC-DJW, Doc. 34, Ex. 106, 11921).

64.     HCF utilizes disposable eating utensils for CRD meals. (*See* Friedman Dec., at ¶ 7; Berry Dec.at ¶ 18).

65.     CRD-designated cooking utensils are used for the service of the CRD menu. These utensils are engraved with a "K" and are kept in a locked cabinet accessible only by Aramark employees. Usage of these utensils is noted in the log book by Aramark. (*See* Buch Aff., at ¶¶ 10-14; Exhibit B, *Martinez* report in 17-CV-3161-SAC-DJW, Doc. 34, Ex. 122-25, 128-29; Friedman Dec. at ¶ 10).

66.     The CRD for general population inmates is plated in a separate area of the kitchen line and is delivered to the inmate in the dining hall. CRD trays do not pass through the same line as non-CRD trays. (*See* Buch Aff., at ¶¶ 25-29; Exhibit B, *Martinez* report in 17-CV-3161-SAC-DJW, Doc. 34, Ex. 103-07; Friedman Dec., at ¶ 18).

67.     CRD meals for inmates in segregation are prepared in the CRD-designated room and stacked in a separate area of the food warmer. (*See* Buch Aff., at ¶¶ 32, 34-35; Exhibit B, *Martinez* report in 17-CV-3161-SAC-DJW, Doc. 34, Ex. 131-33).

68.     Menu items used in the CRD are stored separately from non-CRD food items. (*See* Buch Aff., Ex. E at ¶ 16; Exhibit B, *Martinez* report in 17-CV-3161-SAC-DJW, Doc. 34, Ex. 109-10, 114-16; Friedman Dec., at ¶ 6).

69.     CRD-designated trays, utensils, and pots and pans are washed and stored separately from non-CRD items. (*See* Buch Aff.at ¶¶ 15, 23, 30, 38, 42; Exhibit B, *Martinez* report in 17-CV-3161-SAC-DJW, Doc. 34, Ex. 126-27; Friedman Dec. at ¶¶ 8, 10).

70.     Former KDOC contract manager Patricia Berry periodically conducted inspections of Aramark's delivery of food services at HCF, including Aramark's delivery of the CRD menu. (*See* Berry Dec., at ¶ 10). On September 6, 2017, Ms. Berry conducted an audit inspection of HCF's

food services and found that the authorized menus were being used and the kitchen had appropriate kosher food preparation practices. (*See* Berry Dec., at ¶ 12).

71.     Audit inspections at HCF thereafter have found that authorized menus were being used and that the kitchen had proper kosher food preparation practices.  (*See Id.*).

**Facts regarding El Dorado Correctional Facility ("EDCF")**

72.     Plaintiff was housed at EDCF from June 16, 2016 until his transfer to HCF on March 22, 2017. Plaintiff has not pointed to any evidence in the record indicating that he requested to receive the CRD during this time at EDCF or that Plaintiff ate CRD meals during this time. (*See* Doc. 175 at 11).

73.     Plaintiff is currently housed at EDCF, and has been since June 18, 2019. (*See* Doc. 108-1 at 2; Harris Aff., at ¶ 4).

74.     From the time of his most recent arrival to EDCF on June 18, 2019, Plaintiff has not requested to receive any type of religious diet, including kosher meals. (*See* Harris Aff., at ¶ 5).

75.     For nearly a year, Plaintiff has been receiving and eating non-kosher, regular menu meals at EDCF. (*See* Harris Aff., at ¶ 5).

76.     Requests for religious diets are handled on a facility-by-facility basis. (*See* Doc. 56, at p. 51 (IMPP 10-110D, § V.2)).

77.     Plaintiff has not pursued the grievance process at EDCF. (*See* Doc. 173 at 2).

78.     The CRD menus at EDCF include kosher items. (*See* Berry Dec., at ¶¶ 16, 19 and Exhibit 5 thereto).

79.     KDOC and its Religious Authority, Rabbi Friedman, were ultimately responsible for approving the CRD menus and denying any request by Plaintiff to have his kosher food served as a

sealed, TV-style dinner.  (*See* Declaration of Rabbi Ben Friedman, at ¶¶ 2-4, 20 (hereinafter, "Friedman Dec."), Doc. 133-3).

80.    The CRD menu contains a signature of approval by Aramark's religious authority, Rabbi Fellig.  (*See* Berry Dec., at ¶¶ 16, 19 and Exhibit 5 thereto).

81.    The following provisions appear on each menu: "Follow all kosher preparation instructions in recipes for Entrees, Starches, and Salads. Utensils used for scooping, cooking and serving must be dedicated for kosher food use ONLY and stored in a special area. Serve meal on disposable or designated kosher tray with disposable or kosher only tableware." (*See Id.*)

82.    All food used in the preparation of the CRD menu is sourced from manufacturers that use kosher manufacturing processes and Aramark maintains certificates for these food items verifying they are kosher-certified. (*See* Berry Dec., at ¶ 16(a); Ex. 2 to Berry Declaration; Friedman Dec., at ¶ 7).

83.    All entrée items used in the CRD arrive at EDCF factory sealed, are portioned out of bulk boxes, and are stored on separate shelving units from non-CRD food. (*See* Berry Dec., at ¶ 16(b); Ex. 22-24 to Berry Declaration).

84.    All CRD food items have kosher symbols either on the outer bulk packaging, or on the individual packaging. (*See* Berry Dec., at ¶ 16(c)).

85.    The sliced bread and milk do not have Kosher symbols on the individual packaging. (*See* Friedman Dec., at ¶ 7; Berry Dec., at ¶ 16(c); Ex. 3 to Berry Declaration). Aramark maintains certificates verifying they are in fact kosher. *Id*. The fact that an item served on the CRD does not maintain a kosher symbol on the packaging does not mean the food is not kosher. *Id*.

86.    CRD foods are prepared with their own set of procedures and staff are trained on those procedures by Aramark. (*See* Berry Dec., at ¶ 20; Ex. 5-6 to Berry Declaration).

87.     EDCF utilizes a separate oven for the preparation of warm CRD food, marked with a large red sign that reads "kosher only." (*See Id.* at ¶ 16(d) and Ex. 15 thereto).

88.     The stove is cleaned and sanitized prior to being used for the CRD. (*See Id.* at ¶ 16(e)).

89.     No steam kettles are used in the preparation of CRD food. (*See Id.* at ¶ 16(f)).

90.     EDCF utilizes disposable trays, cups, and sporks for all CRD meals. (*See Id.* at ¶ 16(g) and Ex. 31 thereto).

91.     CRD-designated utensils are used for the service of the CRD menu. These utensils are engraved with a "K" and are kept in a locked cabinet accessible only by Aramark employees. Usage of these utensils is noted in the log book by Aramark. (*See Id.* at ¶ 16(h) and Ex. 1-8, 11 thereto;  Friedman Dec., at ¶ 10).

92.     The CRD for general population inmates is plated in a separate area of the kitchen line. (*See* Berry Dec., at ¶ 16(i) and Ex. 26-29 thereto; Friedman Dec., at ¶ 18).

93.     Cold CRD items are prepared separately on a table wrapped in plastic. (*See* Berry Dec., at ¶ 16(j) and Ex. 17-19 thereto).

94.     Warm CRD items are kept heated in a CRD-designated steam well. (*See Id.* at ¶ 16(k) and Ex. 20 thereto).

95.     CRD meals for inmates in segregation are prepared in the CRD-designated area of the kitchen and stacked in a separate area of the food warmer after being wrapped in plastic. The CRD meals in the warmer do not touch non-CRD meals. (*See Id.* at ¶ 16(l)).

96.     Menu items used in the CRD are stored separately from non-CRD food items. (*See Id.* at ¶ 16(m) and Ex. 22-24 thereto; Friedman Dec., at ¶ 6).

97.     CRD-designated trays, utensils, and pots and pans are washed and stored separately from non-CRD items. (*See* Berry Dec., at ¶ 16(n) and Ex. 1-9 thereto; Friedman Dec., at ¶¶ 8, 10).

98.     Former KDOC contract manager Patricia Berry periodically conducted inspections of Aramark's delivery of food services at EDCF, including Aramark's delivery of the CRD menu. (*See* Berry Dec., at ¶ 10). Her audit inspections of EDCF's food services found that the authorized menus were being used and the kitchen had appropriate kosher food preparation practices. (*Id.* at ¶ 15).

## QUESTIONS PRESENTED

I.     Are Defendants entitled to judgment on Plaintiff's claims under 42 U.S.C. § 1983 and RLUIPA 42 U.S.C. § 2000cc because the Plaintiff's rights to religious exercise were not substantially burdened and because Defendants did not act under color of law?

II.     Has Plaintiff exhausted his administrative remedies at EDCF as required as to any claim that he may have that the CRD menu is insufficient to meet the requirements of Jewish dietary laws?

## STANDARD OF REVIEW

### *Summary Judgment Standard*

Summary judgment is required under Rule 56 of the Federal Rules of Civil Procedure when pleadings, affidavits, and any discovery "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

To determine whether a genuine issue exists, courts will view evidence in the light most favorable to the nonmoving party and will accept only reasonable inferences. *See Allen v. Muskogee*, 119 F.3d 837, 839-40 (10th Cir. 1997). That said, the nonmoving party cannot create a

genuine issue of fact by making allegations that are clearly unsupported by the record as a whole. *Scott v. Harris*, 550 U.S. 372, 378-81 (2007). Further, any factual dispute must be not only genuine – "such that a reasonable jury could return a verdict for the nonmoving party," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) – but also material, as determined by substantive law, *see Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson*, 477 U.S. at 248). Where there is no genuine dispute of material fact regarding just one of the essential elements a plaintiff must prove, then summary judgment must issue in the defendant's favor. *See Sports Unlimited, Inc. v. Lankford Enterp., Inc.*, 275 F.3d 996, 999 (10th Cir. 2002) (citing *Adler*, 144 F.3d at 671).

## ARGUMENTS AND AUTHORITIES

### I.   Court Lacks Jurisdiction Over Plaintiff's Claims for Prospective Relief for Meal Preparation and Service at LCF, HCF, and EDCF.

Plaintiff is seeking relief at LCF, HCF, and EDCF. Plaintiff was housed at LCF when he filed this lawsuit and remained there until his transfer to EDCF on June 16, 2016. Plaintiff applied for and was approved to receive CRD meals while at LCF. Plaintiff was then housed at EDCF from June 16, 2016 until his transfer to HCF on March 22, 2017. Plaintiff has not pointed to any evidence in the record indicating that he requested to receive the CRD at EDCF or that he ate CRD meals at EDCF during this time. Plaintiff was then housed at HCF from March 22, 2017 to January 19, 2018. While at HCF, Plaintiff applied for a religious diet but was not eligible to receive the CRD because he was on a medical diet. Plaintiff does not allege that he consumed any CRD meals while at HCF. Plaintiff is no longer at LCF or HCF, but is currently housed at EDCF and has been since June 18, 2019. Since his transfer to EDCF on June 18, 2019, Plaintiff has not requested to receive any type of religious diet, including kosher meals. For nearly a year, Plaintiff has been receiving non-kosher, regular menu meals. Plaintiff argues that the kitchen

conditions and meal service at LCF, HCF, and EDCF result in CRD ingredients, pans, and utensils having non-Kosher contact, ultimately preventing the meal from being Kosher.

This Court addressed whether Plaintiff's transfers and his action or inaction after those transfers remove the actual controversy before the Court in its May 12, 2020 Order. The Court determined that because Plaintiff is no longer housed at either LCF or HCF, his prospective claims for meal preparation and service at LCF and HCF against Defendants Berry and Allen are moot. (Doc. 175 at 12). *See Jordan v. Sosa*, 654 F.3d 1012, 1027 (10th Cir. 2011) ("Where the prisoner's claims for declaratory or injunctive relief relate solely to the conditions of confinement at the penal institution at which the prisoner is no longer incarcerated, court have concluded that they are unable to provide the prisoner with effective relief."

In its May 12, 2020 Order, the Court also stated that if Plaintiff was no longer requesting or receiving meals under the CRD, this would mean that there was no case or controversy for the Court to decide—at least as to any requests for prospective relief. Because Plaintiff has not requested to be on a religious diet since his most recent transfer to EDCF on June 18, 2019, and has been receiving non-kosher, regular menu meals at EDCF for the past year, Plaintiff's prospective claims for meal preparation and service at EDCF should be dismissed.

The Court's dismissal of Plaintiff's prospective claims for meal preparation and service at LCF and HCF applies equally to any such claims against these Defendants and should likewise be dismissed. In fact for the reasons discussed below, all claims against Defendants should be dismissed because the CRD menus, meal components, and processes at all three facilities are Kosher.

## II.      Plaintiff Did Not Exhaust his Administrative Remedies at EDCF or HCF

While Plaintiff has not received or requested to receive any type of religious diet, including kosher meals, since his most recent transfer to EDCF, Plaintiff's claims should be dismissed regardless because he has failed to exhaust his administrative remedies at both HCF and EDCF.  Again, in its May 12th, 2020 Order, the Court considered the evidence related to Plaintiff's pursuance of the grievance process at all three correctional facilities, noting that Plaintiff had not pursued the grievance process at either HCF or EDCF.  This Court determined that to the extent Plaintiff bases his claims on the method of meal service at HCF and EDCF, rather than KDOC policies relevant to the CRD, Plaintiff must first give KDOC the opportunity to address his new grievances. Because Plaintiff's claims regarding meal service and kitchen conditions at HCF and EDCF are unexhausted, the Court dismissed them without prejudice. (Doc. 175 at 14).  The Court's reasoning for dismissal of these claims equally applies to Defendants. Plaintiff never pursued the grievance process at HCF or EDCF.  Defendants in turn were never given the opportunity to address the alleged grievances.  Plaintiff's claims against Defendants should likewise be dismissed.

The Court's decision was appropriate because under the Prison Litigation Reform Act ("PLRA"), a prisoner must exhaust his administrative remedies before filing an action in federal court challenging the conditions of his confinement under 42 U.S.C. § 1983.  42 U.S.C. § 1997e(a); *West v. Emig*, No. 18-3806, 2019 WL 5061417, at *2 (3d Cir. 2019); *Wiggins v. Corr. Corp. of America*, 27 Fed. Appx. 315, 316 (6th Cir. 2001).  The United States Supreme Court has held "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.".  *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Booth v. Churner*, 532

U.S. 732 (2001).  Exhaustion "is a threshold issue that courts must address to determine whether litigation is being conducted in the right forum at the right time." Dillon v. Rogers, 596 F.3d 260, 272 (5th Cir. 2010).

### III.    Plaintiff's Remaining Claims under 42 U.S.C. § 1983 and RLUIPA 42 U.S.C. § 2000cc Fail as a Matter of Law Because Plaintiff Cannot Establish the Required Elements of Those Claims

Defendants are entitled to summary judgment on Plaintiff's remaining 42 U.S.C. § 1983 and RLUIPA 42 U.S.C. § 2000cc claims because the CRD menus, meal components, and processes at all three correctional facilities are Kosher. (Doc. 175 at 18). The Court has already confirmed that Rabbi Friedman adequately testified to these items being Kosher. (*Id.* at 17). Therefore, Plaintiff's remaining claims against Defendants should be dismissed.

While the Court has before it sufficient grounds to sustain the dismissal of Plaintiff's claims, Defendants will address the requirements of these claims and discuss the uncontroverted facts that demonstrate that Plaintiff was in fact provided with a kosher meal.

Plaintiff asserts a claim against Aramark for alleged civil rights violations under § 1983.

*See Monell v. Dep't of Social Services of the City of New York*, 436 U.S. 658, 694 (1978).  Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.   Importantly, § 1983 does not create substantive rights.  Rather, § 1983 is a procedural method whereby persons can seek review of alleged state and local violations of federal law in federal court.  The purpose of the statute is "to interpose the federal courts between the States and the people, as guardians of the people's federal rights . . . ." *Mitchum v Foster*, 407 U.S.

225, 242 (1972).  To recover under § 1983, a plaintiff must establish two elements: (1) "the violation of a right secured by the Constitution and laws of the United States"; and (2) "must show that the alleged deprivation was committed by a person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).  Where the alleged violation of a constitutional right is premised upon the First Amendment (as it is here), the plaintiff must establish that a substantial burden has been imposed on plaintiff's sincerely-held religious belief, as a result of the defendant's conscious interference. *See Gallagher v. Shelton*, 587 F.3d 1063, 1069-70 (10th Cir. 2009).

A RLUIPA 42 U.S.C. § 2000cc claim, as asserted by Plaintiff, similarly requires both that the defendant acted under color of law and imposed a substantial burden upon the plaintiff's exercise of a sincerely held religious belief.  *See* 42 U.S.C. § 2000cc-1(a); 42 U.S.C. § 2000cc-5(4); *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1312 (10th Cir. 2010).  Here, summary judgment is appropriate because Plaintiff cannot as a matter of law establish either of the elements of a 42 U.S.C. § 1983 claim or a RLUIPA 42 U.S.C. § 2000cc claim.

### A.  Plaintiff Cannot Establish that a Substantial Burden Has Been Placed on a Sincerely Held Religious Belief

In the context of the First Amendment, "inmates are entitled to the reasonable opportunity to pursue their sincerely-held religious beliefs." *Gallagher*, 587 F.3d at 1069 (citation omitted). Whether a "reasonable opportunity" exists is made "in reference to legitimate penological objectives." *Id.* "Consequently, '[t]he first questions in any free exercise claim are whether the plaintiff's beliefs are religious in nature, and whether those religious beliefs are sincerely held.'" *Kay v. Bemis*, 500 F.3d 1214, 1218 (10th Cir. 2007) (quoting *Snyder v. Murray City Corp.*, 124 F.3d 1349, 1352 (10th Cir. 1997), *opinion vacated in part on reh'g en banc*, 159 F.3d 1227 (10th Cir. 1998)).

As an initial matter, Plaintiff cannot establish that his religious beliefs are sincerely held. Indeed, since Plaintiff's most recent transfer to EDCF on June 18, 2019, Plaintiff has not requested to receive any type of religious diet, including kosher meals.  For nearly a year, Plaintiff has been receiving non-kosher, regular menu meals.  (See Harris Aff. at ¶ 5).  Further, Plaintiff has a history of failing to observer kosher dietary practices while simultaneously filing suit seeking access to prepackaged kosher meals. (Doc. 90, at 9, citing *McCoy v. Henderson*, No. 12-3051-SAC, 2013 WL 823380, at *3 (D. Kan. Mar. 6, 2013) (noting McCoy had his kosher meal authorization revoked for purchasing non-kosher commissary items)). Plaintiff's deviation from a kosher diet is evidenced on the face of his commissary purchases as shown on Exhibits 7 and 8 to Defendant Berry's Amended Answer (Doc. 98-7, 98-8). Plaintiff's commissary records establish that he purchased non-certified kosher food items on multiple occasions between 2014 and 2016. *See id.*

In order to allege a constitutional violation based on the free exercise clause of the First Amendment, an inmate must also show a prison regulation "substantially burdened . . . sincerely-held religious beliefs." *Boles v. Neet*, 486 F.3d 1177, 1182 (10th Cir. 2007). A plaintiff bears the burden of proving that a defendant's actions substantially burdened his right of free exercise. *Speed v. Stotts*, 941 F. Supp. 1051, 1056 (D. Kan. 1996).

The Tenth Circuit has defined a "substantial burden" in a free exercise claim as one that: (1) significantly inhibits or constrains religious conduct or expression that manifests some central tenet of a prisoner's individual beliefs, (2) meaningfully curtails a prisoner's ability to express adherence to his faith, or (3) denies a prisoner a reasonable opportunity to engage in fundamental religious activities. *Wares v. Simmons*, 524 F. Supp. 2d 1313, 1320 (D. Kan. 2007) (citing *Vasquez v. Ley*, 70 F.3d 1282, 2 (10th Cir. 1995)). In addition, he must "assert conscious or intentional

interference with his free exercise rights to state a valid claim under § 1983." *Gallagher*, 587 F.3d at 1069.

If a plaintiff does not meet the "substantial burden" test, the inquiry ends; if he does, a defendant may identify legitimate penological interests which justify the impinging conduct. *Wares*, 524 F. Supp. 2d at 1319-20; *see also Boles*, 486 F.3d at 1182 (citation omitted). Once a legitimate penological interest is identified, the court determines the reasonableness of the regulation by balancing the factors set forth in *Turner v. Safley*, 482. U.S. 78, 89-91 (1987).[2] *See Boles*, 486 F.3d at 1181.

As discussed below, Plaintiff's 42 U.S.C. § 1983 claim and RLUIPA 42 U.S.C. § 2000cc claim fail because he cannot meet his burden to establish that provision of a freshly prepared kosher meal (as opposed to a pre-packaged one) substantially burdens his right to freely exercise his sincerely held religious beliefs.[3]  In *Wares*, this Court stated that the Tenth Circuit "has rarely defined or described [substantial burden] . . . in the context of an inmate's pure First Amendment free exercise claim." *Wares*, 524 F. Supp. 2d at 1320. There is no question that the Tenth Circuit has found "prisoners have a constitutional right to a diet conforming to their religious beliefs." *Beerheide*, 286 F.3d at 1185 (citing cases). A complete failure to provide such meals or to impose the cost of provision on the inmates has been deemed constitutionally deficient. *Id.* at 1185-92. *See also Abdulhaseeb v. Calbone*, 600 F.3d at 1317 (finding failure to provide a halal diet sufficiently burdened inmate's religious beliefs in RLUIPA context).

---

[2] *Turner* requires consideration of the following factors: "(1) whether a rational connection exists between the prison policy regulation and a legitimate government interest advanced as its justification; (2) whether alternative means of exercising the right are available notwithstanding the policy or regulation; (3) what effect accommodating the exercise of the right would have on guards, other prisoners, and prison resources generally; and (4) whether ready, easy-to-implement alternatives exist that would accommodate the prisoner's rights." *Beerheide v. Suthers*, 286 F.3d 1179, 1185 (10th Cir. 2002) (citing *Turner*, 482 U.S. at 89-92).
[3] Plaintiff's claims also fail because his beliefs are not sincerely held.  *See* Doc. 133, at 31-34; Doc. 90, at 9.

Plaintiff also cannot establish that his rights were (or are) substantially burdened by Aramark's acquisition, storage, preparation, or service of the CRD. The Plaintiff's belief in a kosher diet is not substantially burdened when he is offered a menu that contains kosher food prepared by inmate workers trained to observe Jewish dietary laws.  Plaintiff has not been prevented from participating in the consumption of kosher food since he has had access to a diet that is in fact kosher. The menus all reflect that kosher food is served at every CRD meal. KDOC and its Religious Authority, Rabbi Friedman, were ultimately responsible for approving the menus, which were confirmed as meeting kosher dietary requirements. The menus are approved by Aramark's Religious Authority, Rabbi Fellig, to ensure that the menus meet kosher dietary requirements.

Aramark maintains policies and procedures regarding the preparation, storage, and service of the CRD. These procedures are approved by Aramark's Religious Authority, Rabbi Fellig. These procedures were also approved by KDOC's Religious Authority, Rabbi Friedman. Inmates who work in the kitchen are trained in CRD food preparation to ensure compliance with Jewish dietary laws.

Plaintiff is not a Rabbi, has provided no evidence that he has rabbinical training, and has no province to testify as to the requirements of such training. He has also proffered no expert to testify as to such issues.  As previously stated, Aramark relies upon their Religious Authority, Rabbi Fellig, to ensure compliance with Jewish dietary laws.

Further, to the extent that Plaintiff's claims are premised on the allegation that he was not served kosher food in a sealed, TV-style dinner as he requested, Plaintiff cannot establish the requisite Aramark policy, custom or practice that caused the alleged Constitutional violation and the deliberate indifference or interference with his free exercise rights by Defendants (*i.e.*, Aramark and

its employees).[4]   KDOC and its Religious Authority, Rabbi Friedman – and not Aramark and its employees – were ultimately responsible for approving the CRD menus and denying any request by Plaintiff to have his kosher food served in a sealed, TV-style dinner.  Indeed, Aramark has no objection to serving Plaintiff kosher food in a sealed, TV-style dinner if the KDOC contracted for that service and paid Aramark accordingly.   However, to be liable under § 1983, it must be a defendant's **own** policy or custom that causes the deprivation of a plaintiff's civil rights.   *Shields*, 746 F.3d at 790; *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017).

In addition, Plaintiff cannot as a matter of law establish that Aramark acted with deliberate indifference because Aramark simply provided the diet to the Plaintiff as specified in its contract with the KDOC.   Indeed, Aramark does not have the authority to decide to provide a specific inmate with a specialized diet (sealed, TV-style dinner).   Other courts have recognized that Aramark is not capable of acting with deliberate indifference when the food it provides to inmates is dictated by a contract between Aramark and the correctional facility.

In *DeJesus v. Aramark Food Service, Inc.*, 2014 U.S. Dist. LEXIS 4952, No. 13-5734 (E.D. Pa. Jan. 14, 2014), the court granted Aramark's Motion to Dismiss in a case where the plaintiff, an inmate, alleged that Aramark violated his constitutional rights by failing to provide him with an alternative diet after he developed sores in his mouth (which he claimed were due to the presence of citric acid in the prison's standard meals).   The court held that plaintiff failed to plead a plausible civil rights claim because plaintiff did not and could not allege that Aramark "had the authority to determine the meals" the plaintiff received and therefore could not allege the requisite

---

[4] *See Farmer v. Brennan*, 511 U.S. 825, 825-26 (1994); *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997); *Bosarge v. Brown*, No. 1:13CV564-KS-MTP, 2015 WL 5156767, at *5 (S.D. Miss. Sept. 2, 2015) ("Mere negligence on the part of the jail officials in the way they manage the food services does not amount to a constitutional violation."); *Parris v. Aramark Foods, Inc.*, No. 11-5556, 2012 WL 1118672, at *6 (D.N.J. Apr. 2, 2012) (citing *Farmer*, 511 U.S. at 835).

deliberate indifference on the part of Aramark.  (*Id.*, at *12). ).   Likewise, in *Jones v. Western Tidewater Regional Jail*, the plaintiff brought an Eighth Amendment claim against Aramark for failing to provide him with a proper vegan diet while incarcerated.  187 F. Supp. 3d 648 (E.D. Va. 2016).  The plaintiff specifically claimed that Aramark denied him "bananas and other foods with potassium, causing his potassium levels to drop."  *Id.* at 656.  The court denied plaintiff's claim and entered judgment in favor of Aramark, holding in relevant part that because Aramark "did not have any authority or discretion to alter the Plaintiff's meal plan in any way. . . . [it] could not have acted with deliberate indifference to Plaintiff's medical needs."  *Id.* at 657-58.

Additionally in the present case, even the entity with the "authority to determine the meals" – KDOC – acted reasonably in denying any request from Plaintiff for a specialized kosher diet given the cost considerations involved in accommodating such specialized requests from inmates. (*See Lunsford v. Bennett*, 17 F.3d 1574, 1579 (7th Cir. 1994) ("The Constitution does not require prison officials to provide the equivalent of hotel accomodations."); *Curry v. California Dept. of Corrections*, 2013 WL 75769, No. C-09-3408 EMC (pr), at *9 (N.D. Cal. Jan. 4, 2013) (citing numerous cases in which courts have recognized cost containment as a compelling state interest in denying specialized inmate meal requests under RLUIPA); Doc. 90, at p.9 ("The court notes, that it is aware of no case law suggesting that prisoners have a constitutional right to factory-sealed TV dinners.")).

### 1.      The Acquisition and Storage of CRD Menu Items Does Not Substantially Burden Plaintiff's Rights

Plaintiff claims the food used for the CRD menu has no kosher markings and is therefore not kosher. (Doc.56 at 11). Plaintiff is misinformed regarding the nature of menu items used in the CRD program. The purchase of food used to prepare the CRD in all KDOC facilities is coordinated by Aramark's dietician to ensure all menu items meet kosher requirements. All CRD menu items are

ordered from manufacturers that use kosher manufacturing processes. All CRD menu items are kosher certified. With the exception of sliced bread and milk, all food items served to inmates receiving the CRD have kosher symbols either on the outer bulk packaging, or on the individual packaging. However, the sliced bread and milk have been confirmed Kosher and verification of this is maintained by Aramark. The fact that an item served on the CRD does not maintain a kosher symbol on the packaging does not mean the food is not kosher.

Next, Plaintiff alleges the meal components used for the CRD are stored with non-kosher food. This allegation is conclusory in nature, is made in passing, and the Complaint includes no specific facts or evidence regarding the storage of CRD menu items at any of the facilities. Regardless, the storage of CRD-menu items meets Jewish dietary requirements. All CRD entrée items arrive at KDOC facilities factory sealed. They are purchased and shipped in bulk boxes and broken down into smaller portions to be used according to a set menu rotation schedule. These items are then stored on separate shelving units to distinguish them from food served to inmates on the non-CRD menu. Items that are inherently kosher (fruit and vegetables) are portioned out of bulk packaging as necessary and stored in the cooler until they are used in the weekly menu schedule. Likewise, items that are kosher and are used for all diets are portioned out of bulk packaging as necessary and stored in CRD-designated shelving areas until they are used in the weekly menu schedule. These items do not come into contact with non-kosher food products. The acquisition and storage of CRD menu items at HCF, LCF, and EDCF does not substantially burden Plaintiff's rights.

2. **The Preparation, Service, and Cleaning Procedures of the CRD Do Not Substantially Burden Plaintiff's Rights at Any of the Three Facilities at Issue**

Plaintiff cannot establish that the CRD meals provided to him, or the preparation of those meals, amount to a substantial burden on his sincerely held religious beliefs with respect to any of the three facilities at issue, as addressed in this section. A detention facility that utilizes a designated kitchen space for preparation of religious meals does not place a substantial burden on an inmate's right to practice his religion. *Green v. Werholtz*, No. 08-3260-JAR, 2010 WL 3878772, at *4 (D. Kan. Sept. 28, 2010) (finding no constitutional violation when kosher meals were prepared in separate area of the prison kitchen using religiously-designated utensils that were stored and cleaned separately).

As previously stated, Aramark has policies in place to ensure kosher meals are prepared, served, and cleaned properly. These policies were reviewed and approved by Aramark's religious advisor. All inmates approved to work in the CRD area are trained and monitored by Aramark supervisors. At best, Plaintiff's Complaint alleges no more than unsupported isolated acts of negligence with respect to alleged cross-contamination.[5] Given the approval of the CRD policies and procedures by at least two Religious Authorities, Plaintiff utterly fails to come forward with any non-speculative and plausible allegations that KDOC kitchens and Aramark and its employees

---

[5] *See Strope v. Cummings*, 2009 WL 3045463 (D. Kan. September 22, 2009); *White v. Glantz*, 986 F.2d 1431 at *2 (10th Cir. 1993) (holding that an isolated delivery of meal containing pork to a Muslim prisoner was no more than negligence and did not support a First Amendment free exercise claim); *Franklin v. True*, 76 F.3d 381 (7th Cir. 1996) (unpublished) (concluding that one instance of food poisoning is insufficient to state conditions of confinement claims); *George v. King*, 837 F.2d 705, 707 (5th Cir. 1998) ("A single incident of unintended food poisoning, whether suffered by one or many inmates at an institution, does not constitute a violation of the constitutional rights of the affected prisoners."); *Jackson v. Lang*, 2010 U.S. Dist. LEXIS 82852, *2-*3 (N.D. Ill. Aug. 10, 2010) (noting one incident of finding rodent parts in meal did not rise to level of constitutional violation); *Miles v. Konvalenka*, 791 F. Supp. 212, 213 (N.D. Ill. 1992) (holding no legal basis for constitutional violation when inmate found a mouse in another inmate's meal but did not allege that he consumed or became sick from the food); *Murray v. C/O Allen, et al.*, 2010 U.S. Dist. LEXIS 113004, *6-*7 (E.D. Pa. 2010) (finding single incident of object found in prisoner's food is not constitutional violation); *Smith Bey v. CCA/CTF, et al.*, 703 F. Supp. 2d 1, 8 (D.C. 2010) (noting two instances of cockroaches in prisoner's food does not rise to level of constitutional violation); *Walker v. Dart, et al.*, 2010 U.S. Dist. LEXIS 85230, *19-*20 (N.D. Ill. 2010) (stating to prevail on § 1983 claim regarding pest infestation, plaintiff must show persistent problem and significant physical harm); *Sanchez v. Walker*, 2010 U.S. Dist. LEXIS 134566, *26-*27 (N.D. Ill. 2010) (holding single incident of finding rodent in food does not indicate deliberate indifference to support § 1983 action).

do not comply with kosher dietary laws in the preparation of the CRD. *See Holsombach v. Norris*, No. 2:08CV00022JMMBD, 2009 WL 424166, at *6 (E.D. Ark. Feb. 18, 2009); *see also Blake v. Rubenstein*, No. CV 2:08-0906, 2016 WL 5660355, at *16 (S.D.W. Va. Apr. 5, 2016); *Greene v. Cabral*, 323 F.Supp.3d 96, 111 (D. Mass. 2018) (speculative claims of cross-contamination and isolated alleged acts of cross-contamination are insufficient to form a basis for a constitutional violation).

### *LCF*

The CRD program at LCF meets all kosher dietary requirements. As Plaintiff concedes in his Complaint, the LCF kitchen maintains a separate locked room within the larger kitchen area to be used exclusively for preparation and cleaning of meal items comprising the CRD. Only those inmates trained in CRD preparation methods are allowed entry into these locked rooms. The CRD preparation rooms have several sinks used exclusively for cleaning items used in the preparation and service of CRD food.

LCF uses separate utensils and cookware designated exclusively for the CRD, and these items are washed and stored separately from items that are used to prepare regular meal items. CRD cooking and serving utensils are distinguishable by two additional holes drilled in the handles, and are stored in locked cabinets to which only supervisors have access. All kosher utensil usage is noted in the utensil log book by the Aramark supervisor. Similarly, the facility uses CRD-designated trays, differentiated by color. CRD trays and cooking utensils are washed and stored separately from trays and cooking utensils used for serving non-CRD food items. Pots and pans used for the preparation of the CRD are washed and stored separately on CRD-designated shelves. CRD-designated pots and pans are distinguishable by a black Teflon lining inside the pan. LCF utilizes disposable eating utensils that are discarded after use.

Cool CRD menu items are prepared separately either in the CRD room or on the CRD-designated table just outside the CRD room. Warm CRD menu items are prepared in CRD-designated steam kettles or are reheated in a CRD-designated oven. The food is then transferred to a CRD-designated steam well until taken to the line for service.

CRD meals for general population inmates at LCF are served prior to regular menu meals, and do not come into contact with non-CRD food items. CRD meals for inmates in segregation are prepared on the CRD-designated table and are then stacked in a separate area of the food warmer to await service in the segregation housing unit. After service of the CRD meals, inmates pass the trays through the tray slot. The trays are then collected in a tub and taken to the CRD-designated room to be washed. These procedures conform with Jewish dietary laws.   (*See* Statement of Facts, *supra*, LCF Section).

### HCF

Plaintiff's Complaint demonstrates he has no personal knowledge of the HCF kitchen. His statements regarding HCF are limited to one page of his Third Amended Complaint, are conclusory in nature, relate almost exclusively to the service of meal trays to inmates in segregation, and do not provide facts specific as to any alleged violation of his rights. Even though Defendant's claims for prospective relief for meal preparation and meal service at HCF have already been dismissed by the Court (Doc. 175 at 12), Defendants will address HCF's CRD program out of an abundance of caution.[6]

Similar to LCF, the HCF kitchen maintains a separate locked room within the larger kitchen area to be used exclusively for preparation and cleaning of meal items comprising the CRD. Only

---

[6] Since no *Martinez* Report was ordered in this case as to either HCF or EDCF but rather was limited to LCF as per Plaintiff's Complaint, Defendants refer to relevant portions of the *Martinez* Report filed in *Jefferson v. Aramark Correctional Serv.*, 17-CV-3161-SAC, subject to judicial notice as per Fed. R. Evid. 201.

those inmates trained in CRD preparation methods are allowed entry into this locked room. The CRD preparation room has several sinks used exclusively for cleaning items used in the preparation and service of CRD food.

HCF prepares all cold CRD menu items in the CRD-designated room. Warm food is prepared on a CRD-designated stovetop and is then taken to the CRD-designated warmer until service. HCF maintains a separate CRD-designated stove and oven. The stove used in CRD food preparation has its own ventilation hood.

HCF uses separate cooking utensils and cookware designated exclusively for the CRD, and these items are washed and stored separately from items that are used to prepare regular meal items. CRD utensils are distinguishable by a "K" marking on the handle, and are stored in locked cabinets to which only supervisors have access. All kosher utensil usage is noted in the utensil log book by the Aramark supervisor. Similarly, the facility uses CRD-designated trays, differentiated by color. CRD trays are washed and stored separately from trays used for serving non-CRD food items. Pots and pans used for the preparation of the CRD are washed and stored separately on CRD-designated shelves. HCF presently utilizes disposable eating utensils for all CRD meals. All CRD-designated items are washed in CRD-designated sinks.

Likewise, the service of the CRD is separated from non-CRD food service. CRD meals for general population inmates are plated on separate tables in the service area and delivered to the inmate in the dining hall. CRD meals for inmates in segregation are prepared in the CRD-designated room and placed in separate areas of the food warmer to await service in the segregation housing unit. After service, trays are passed through the tray slot in the dining hall and taken to the CRD-designated room to be washed. These procedures comport with Jewish dietary laws. (*See* Statement of Facts, *supra*, HCF Section).

**EDCF**

Plaintiff's claims regarding EDCF are without merit as the CRD program at EDCF meets Jewish dietary requirements. His Complaint makes only a few conclusory allegations about the service of CRD trays to inmates housed in segregation at EDCF (without showing that he was one of the inmates to whom the CRD trays were delivered).   The Court dismissed Plaintiff's claims regarding meal service and kitchen conditions at EDCF because they were unexhausted (Doc. 175 at 14).   The same ruling should be applied to these Defendants.    To the extent there is any remaining question about these claims, Defendants have provided facts herein showing that EDCF maintains a CRD program meeting kosher dietary requirements.

EDCF maintains a separate area of the kitchen for CRD food preparation. EDCF uses separate cooking utensils and cookware designated exclusively for the CRD, and these items are washed and stored separately from items that are used to prepare regular meal items. CRD cooking and serving utensils are distinguishable by engravings on the handles, and are stored in locked cabinets to which only supervisors have access. All kosher utensil usage is noted in the utensil log book by the Aramark supervisor. CRD cooking utensils are washed and stored separately from cooking utensils used for serving non-CRD food items. Pots and pans used for the preparation of the CRD are washed and stored separately in the separate, locked CRD cabinet. EDCF utilizes disposable eating utensils, trays, and cups that are discarded after use.

Cool CRD menu items are prepared separately on a table that has been wrapped in plastic. Warm CRD menu items are prepared in CRD-designated pots on the stovetop or are reheated in a CRD-designated oven. The CRD-designated oven is distinguishable by a large red "Kosher Only" sign. The food is then transferred to a CRD-designated steam well until taken to the line for service.

CRD meals for general population inmates at EDCF are served on a separate area of the serving line and do not come into contact with non-CRD food items. CRD meals for inmates in segregation are prepared in the CRD-designated area and are then wrapped in plastic and stacked in a separate area of the food warmer to await service in the segregation housing unit. These meals do not touch non-CRD meals in the warmer. All cups, plates, and eating utensils are single-use and are discarded after use. The EDCF procedures comply with Jewish dietary laws.   (*See* Statement of Facts, *supra*, EDCF Section).

In sum, the record reflects that all three facilities have policies and procedures in place to ensure adequate acquisition, storage, preparation, service and cleaning of the CRD menu items. Plaintiff cannot show that the CRD does not meet Jewish dietary requirements.  His claims should be dismissed accordingly.

### 3.    Plaintiff Cannot Establish That Defendants Consciously or Intentionally Interfered With His Free Exercise Rights

Even if Plaintiff's allegations regarding cross-contamination could be proven by competent admissible evidence (which is clearly not the case), those alleged violations amounted at most to isolated acts of negligence that do not rise to the level of a constitutional violation and therefore cannot support a 42 U.S.C. § 1983 claim or a RLUIPA 42 U.S.C. § 2000cc claim. Consistent with the Court's findings regarding Defendant Allen (Doc. 175 at 20), Plaintiff has provided no evidence that these Defendants consciously or intentionally interfered with his free exercise rights, let alone acted with discriminatory purpose. Therefore, Plaintiff's claims should be dismissed.

The lack of such evidence has been used many times to dismiss similar claims. For example, the case of *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) had similar facts to this case and is instructive. In *Gallagher*, the plaintiff alleged that the defendants denied him the right to a kosher diet. The plaintiff alleged that his food was not prepared according to kosher requirements.

Specifically, serving utensils that were reserved for the kosher food preparation were improperly cleaned with non-kosher utensils. *Id*. at 1070. The court in *Gallagher* stated, taking the plaintiff's "allegations as true, the fact that the utensils were not properly washed indicates that the defendants imperfectly implemented the kosher requirements, or were even negligent in implementing his kosher diet. But there is no basis to conclude that any of the defendants deliberately contaminated the kosher utensils, in violation of [plaintiff's] right to free exercise of religion." *Id*.[7]

This is similar to Plaintiff's allegations in this case. Plaintiff claims that at LCF, the utensils and pans used in the preparation and service of the CRD are washed in the same areas as dishes used for non-kosher meals. (Doc. 56 at 7). To the contrary, the record reflects that LCF utilizes CRD-designated utensils and cookware and all items utilized in the CRD are washed in CRD-designated areas. Plaintiff's Complaint contains no specific facts regarding the cleaning and storage of CRD items at EDCF or HCF. Similar to *Gallagher*, Plaintiff cannot show that Defendants or inmate workers deliberately contaminated the items used in the CRD preparation, storage, or service.

Plaintiff's allegations of misconduct and negligence by inmate workers do not rise to the level of a constitutional violation. In *Holsombach v. Norris*, No. 2:08CV00022JMMBD, 2009 WL 424166, at *6 (E.D. Ark. Feb. 18, 2009), the plaintiff had never been inside the facility kitchen and because he lacked personal knowledge of the workings of the kosher kitchen, he called two inmates to testify on his behalf. *Id*. These inmates provided testimony indicating there were incidents in which the procedures established to provide kosher meals were not followed by staff or inmates.

---

[7] *See also Kanatzar v. Cole,* No. 17-3115-SAC, 2018 WL 3495844, at *4 (D. Kan. July 20, 2018) (finding isolated acts of negligence that were not "conscious or intentional interference with plaintiff's free exercise rights" did not rise to level of constitutional violation); *Hachmeister v. Kline,* No. 12-3263-SAC, 2013 WL 237815, at *5 (D. Kan. Jan. 22, 2013) ("...mere inconvenience, negligence, and isolated or sporadic incidents are not sufficient to show a substantial burden.").

The court stated "Defendants cannot be held... to an absolute standard. They must take reasonable measures, but are not liable for random incidents of misconduct by inmates." *Id*.

Similarly, in *Blake v. Rubenstein*, No. CV 2:08-0906, 2016 WL 5660355, at *16 (S.D.W. Va. Apr. 5, 2016), the plaintiff made allegations that cross-contamination of trays and utensils resulted in non-kosher food and therefore substantially burdened his rights. The defendant responded that all trays and utensils are distinguishable by color and are stored in separate areas from non-religious food items. *Id*. Plaintiff filed fourteen affidavits from inmates stating they had witnessed cross-contamination. *Id*. The court stated:

> Although the Inmate Affidavits indicate that cross-contamination had occurred in the past, Plaintiffs produce no evidence indicating that cookware, trays, and utensils were not replaced upon notification of cross-contamination. Furthermore, there is no indication that Plaintiffs were forced to eat from cookware, trays, or utensils that were known to be cross-contaminated.

*Id*. at 17 (citing *Lovelace*, 472 F.3d 174, 194 (4th Cir. 2006) (RLUIPA is not intended to remedy negligent violations of inmates' religious practices.)) The court further reasoned that "[t]he record...clearly reveals that [the facility] has implemented...policies and protocols to ensure against cross-contamination. . .." *Id*. at *17.

Similar to *Holsombach* and *Blake*, Plaintiff has made allegations of cross-contamination of the items used in the CRD program. Unlike in *Holsombach* and *Blake*, however, Plaintiff has submitted no admissible evidence to show that the CRD procedures are being incorrectly implemented causing the kosher food to become non-kosher. Plaintiff simply relies on his alleged "investigation" in the LCF kitchen and an alleged conversation with another inmate on an unknown date.  Plaintiff's hearsay statements are insufficient to establish a violation of either § 1983 under the applicable standard as stated above – it is policies and protocols that count, not isolated incidents.

Notably, even Plaintiff's alleged conversation with Inmate Peppers shows that the CRD menu is prepared separately from the non-CRD menu. (Doc. 56 at 24, ¶ 49). Evan Hitchcock explained one of his roles as general manager is to train and supervise food service teams. *Id.* Inmate staff members are trained to keep non-kosher food, pots, and utensils separated from the kosher preparation area. To ensure compliance with the contract, including Aramark's obligations with respect to the CRD menu, separate defendant Patricia Berry (former Contract Manager for KDOC) conducted periodic audit inspections of all three facilities.  On Ms. Berry's audit visits of LCF, EDCF and HCF, she found the authorized menus were being used and that the kitchen was implementing appropriate kosher food preparation practices. Plaintiff's alleged isolated acts of negligence do not amount to a substantial burden on his religious beliefs, and his 42 U.S.C. § 1983 claim and RLUIPA 42 U.S.C. § 2000cc claim therefore fail as a matter of law.

**B.**    **Plaintiff Cannot Establish that Defendants Were Acting Under Color of State Law**

The traditional definition of acting under color of state law requires that the defendant(s) "have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West v. Atkins*, 487 U.S. 42, 48-49 (1998). The Tenth Circuit has applied a variety of tests to determine whether a private actor's conduct is considered under "color of law" for purposes of § 1983:

> In some instances, the Court has considered "whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself. The Court has also inquired whether the state has "so far insinuated itself into a position of interdependence" with the private party, that there is a "symbiotic relationship" between them. In addition, the Court has held that if a private party is "'a willful participant in joint activity with the State or its agents,'" then state action is present. Finally, the Court has ruled that a private entity that exercises "powers traditionally exclusively reserved to the State" is engaged in state action.

*Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447 (10th Cir. 1995) (internal citations and quotations omitted).  However, the key under each test is that the conduct must be "fairly attributable to the State," such that the person who engages in the conduct is said to be a "state actor."  *Id.* at 1447.  "In order to establish state action, a plaintiff must demonstrate that the alleged deprivation of constitutional rights was caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible." *Id.* at 1447-48.

For the reasons discussed below, Plaintiff has not and cannot establish that Defendants were acting under color of law.

## 1.   Plaintiff Cannot Demonstrate that Aramark Is a "Person" or "State Actor" that Acted "Under Color of State Law"

Generally, a private corporation that provides services to or on behalf of a governmental entity is not automatically construed as a state actor or said to be acting under "color of state law." In *Johnson v. Corr. Corp. of Am.*, the plaintiff sued the Corrections Corporation of America, (an independent contractor operating in the Leavenworth Detention Center) under § 1983, alleging a violation of his Eighth Amendment rights.  2008 U.S. Dist. LEXIS 61645, at * 1 (D. Kan. Aug. 11, 2008).  This Court explained that the Corrections Corporation of America is not a "person" that is "amenable to suit under § 1983."  *Id.* at *5-6.  Rather, the Corrections Corporation of America is a private corporation contracted to house prisoners, and neither it nor its employees were state actors for purposes of § 1983.  *Id.* at * 6-7.  Furthermore, neither the nurse for the corporation that gave plaintiff a shot intended for a different inmate (which was an overdose) nor any other defendants employed by the Corrections Corporation of America were acting as state officers or with authority from the state.  *Id.*

In *Hachmeister v. Kline*, the plaintiff was an incarcerated pro se litigant who filed a suit under § 1983, alleging that defendants failed to properly prepare and serve him with halal meals during Ramadan.  2013 U.S. Dist. LEXIS 8323, at *1 (D. Kan. Jan. 22, 2013).  In that case, plaintiff received a religious certified diet after converting to Islam.  *Id.* at *5.  During his observance of Ramadan, the *Hachmeister* plaintiff received his meal before sundown, which he could not eat. *Id.* at * 6.  Additionally, plaintiff received certain foods that were not in accordance with Islamic dietary laws.  *Id.*   He named Aramark Correctional Services and its Director, Mary Fletcher, as defendants.  *Id.* at * 13.  Upon initial screening of the case, this Court dismissed Aramark and Fletcher.  First, this Court unequivocally stated that Aramark is not a "person or shown to have acted under color of state law," presumably because plaintiff did not explain Aramark's alleged involvement with respect to the claimed violation.  *See Id.* at 13.  Defendant Fletcher was also dismissed because the Complaint lacked "a single act taken by defendant Fletcher" and thus, plaintiff failed to alleged personal participation.  *Id.* at 14.  Thus, this Court held that plaintiff failed to allege sufficient facts to show either personal participation or legal liability under § 1983. *Id.*

In *Harrison v. Richardson*, the claimant brought a claim under § 1983 alleging that the Leavenworth Kansas Detention Center ("LDC") violated several of his rights guaranteed by the United States Constitution.  2009 U.S. Dist. LEXIS 25820, at * 1 (D. Kan. March 19, 2009).  This Court held that "[a]lthough Plaintiff makes the conclusory allegation that each defendant acted under color of state law, his complaint is against the LDC.  The [LDC] is not a state agency and its employees are not state employees or actors.  They therefore do not act under 'color of state law." *Id.* at * 5.

In this case, it is indisputable that Aramark is a private corporation and private prison food services contractor (and not a state agency), and that its employees assigned to work at a prison

are private employees (and not state employees). Plaintiff's Third Amended Complaint fails to even allege that Aramark was acting under "color of law," and Plaintiff's claims are properly dismissed as a result. Further, as in *Hachmeister*, this Court should hold that Aramark cannot be considered a "person" for purposes of § 1983. Such Complaint lacks allegations as to Aramark's role at these facilities and Aramark's relationship to KDOC sufficient to suggest that Aramark acted under color of law. Plaintiff also has not pled and cannot establish that Aramark is a governmental entity. While Plaintiff summarily claims that Aramark made or enforced policies about food selection and preparation that violated his religious beliefs, such threadbare allegations do not demonstrate that Aramark was a state actor. Therefore, Plaintiff's Third Amended Complaint against Aramark should be dismissed.

### 2. Plaintiff Cannot Demonstrate that Individual Defendants Dockendorff and Church Acted Under Color of Law

In *West v. Atkins*, the Supreme Court was explicit in stating that a person acts under "color of state law" only when such person "exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." 487 U.S. 42, 48-49 (1998).

Here, Defendants Dockendorff and Church are neither state actors, nor state employees. Rather, they are the employees of a wholly private entity that contracts with detention facilities in the State of Kansas. Defendants Dockendorff and Church lack the requisite ability to act under color of law and (also as Plaintiff's Third Amended Complaint fails to demonstrate) did not exercise power that was given to them by virtue of state law because their roles were a function asked of them by a private employer.

At no point were Defendants Dockendorff or Church employed by the state, nor did they have a contract with the state. Rather, they were privately employed persons, as even Plaintiff

alleges. (ECF No. 18, p. 1, ¶ 3; p. 2, ¶ 6). Further, Plaintiff has failed to provide any factual allegations to suggest that Defendants Dockendorff and/or Church were acting under color of state law, which is telling that Plaintiff has no true claim against Dockendorff or Church. As a result, Plaintiff's Third Amended Complaint against Defendants Dockendorff and Church should be dismissed.

## CONCLUSION

Defendants are entitled to summary judgment on Plaintiff's claims against Defendants under 42 U.S.C. § 1983 and RLUIPA 42 U.S.C. § 2000cc. The reasoning behind the entry of the May 12, 2020 Order granting summary judgment is equally applicable to the facts of this case and require the entry of summary judgment herein. Plaintiff's claims fail as a matter of law because as this Court previously found, Plaintiff cannot establish the required elements of those claims. Even if he had, he failed to exhaust his administrative remedies at EDCF. Additionally, because Plaintiff has not requested to receive any type of religious diet, including kosher meals, since his most recent transfer to EDCF, and has been receiving non-kosher, regular menu meals for nearly a year, plaintiff's claims for prospective relief at EDCF are moot.

WHEREFORE, for all of the reasons stated herein and in its Motion for Summary Judgment, Defendants pray that their Motion for Summary Judgment be granted, granting judgment as a matter of law in favor of Defendants on Plaintiff's claims against Defendants under 42 U.S.C. § 1983 and RLUIPA 42 U.S.C. § 2000cc, and for such other and further relief as this Court deems just and proper.

Respectfully submitted,

/s/ Dylan L. Murray
Dylan L. Murray              KS #25417
James S. Kreamer            KS #14374
BAKER STERCHI COWDEN & RICE, LLC
2400 Pershing Road, Ste. 500
Kansas City, Missouri 64108
Phone:  (816) 471-2121; Fax:  (816) 472-0288
Email:  dmurray@bscr-law.com
          kreamer@bscr-law.com
**ATTORNEYS FOR DEFENDANTS
ARAMARK CORRECTIONAL SERVICES,
LLC, JULIE DOCKENDORFF, AND PAUL
CHURCH**

## CERTIFICATE OF SERVICE

I certify that on this 11th day of June, 2020, I electronically filed the foregoing with the Clerk of the Court using the Court's CM/ECF system, which will send notification of the same to all counsel of record as indicated below.  A copy was also served on Pro Se Plaintiff via first class mail.

Deron McCoy, Jr. #76894
El Dorado Correctional Facility
P.O. Box 311
El Dorado, Kansas 67042
KDOC_court_file_edcf@ks.gov
**PRO SE PLAINTIFF**

Jeff Cowger
Sherri L. Price
Kansas Department of Corrections
714 SW Jackson, Suite 300
Topeka, Kansas 66603
Jeff.Cowger@ks.gov; Sherri.Price@ks.gov
**ATTORNEYS FOR INTERESTED PARTY
KANSAS DEPARTMENT OF CORRECTIONS**

Elizabeth M. Phelps
3700 SW Churchill Road
Topeka, Kansas 66604
lilybell@cox.net
**ATTORNEY FOR CHERYL ALLEN**

/s/ Dylan L. Murray